## ANDERSON et al. v. ANDERSON et al.

No. 2416.   Decided May 9, 1913.   (134 Pac. 553).

1. WILLS—UNDUE INFLUENCE—EVIDENCE—SUFFICIENCY. In an action to set aside the probate of a will, evidence *held* insufficient to sustain special findings by the jury that the provisions of the will for the support and education of the testator's son, and the giving of the residue of the estate and the amount bequeathed to the son, in case he should die during minority without issue, to the testator's brothers were procured by undue influence. (Page 29.)

2. WILLS—VALIDITY—"UNDUE INFLUENCE." To constitute undue influence which can vitiate a will, the influence must be such that the testament is in fact the will of the person exercising the influence, and not of the testator.[1]   (Page 36.)

---

[1] Miller v. Livingstone, 31 Utah, 415, 86 Pac. 338.

3. WILLS—VALIDITY—UNDUE INFLUENCE—PHYSICIAL RESTRAINT. Undue influence sufficient to avoid a will may be established without showing any physical coercion or restraint.   (Page 37.)

4. WILLS—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE—CONCEALMENT OF EXECUTION. The fact that the testator did not inform his wife, with whom he was living happily, that he had made a will is not evidence of undue influence on the part of his brothers, where it did not appear that they had anything to do with the concealment, or even knew of it.   (Page 38.)

5. WILLS—VALIDITY—DISPOSITION OF PROPERTY—WISDOM. The court cannot substitute its judgment or that of the jury for the will of the testator as to the disposition of his property, even though their disposition of it may be wiser than his.   (Page 38.)

STRAUP, J., dissenting.

APPEAL from District Court, Third District; *Hon. M. L. Ritchie,* Judge.

Action by Rose L. Anderson and another against Heber L. Anderson and another.

Judgment for plaintiffs.   Defendants appeal.

REVERSED AND JUDGMENT DIRECTED FOR THE DEFENDANTS.

*C. E. Marks* and *Hurd & Hurd* for appellants.

*D. W. Moffat* and *H. Van Dam, Jr.* for respondents.

FRICK, J.

This proceeding is based on the provisions of Comp. Laws 1907, section 3796, to revoke the probate of the last will and testament of one Paul Anderson, deceased. The action was instituted by the widow of the deceased in her own behalf and also as guardian *ad litem* on behalf of her infant son, Ray Anderson, of the age of three years, who, with herself constitute the only heirs at law of said decedent. The grounds upon which she sought to revoke the probate of said will were want of testamentary capacity on the part of decedent, and that the will was procured through undue influence practiced upon him by his brothers, John and Heber Anderson, the

latter being named in the will as executor, and duly appointed as such by the court at the time the will was admitted to probate.

Heber Anderson, both as executor and in his individual capacity as a beneficiary under the will, was made a party to the proceeding, and John Anderson was also made a party as residuary legatee under the will. Heber Anderson filed an answer as executor to the petition, and he and John also filed a joint answer thereto which, after admitting the execution of the will, the death of Paul Anderson, and the probate of said will, denied all of the material allegations of the petition.

Upon the issues thus joined, a trial to a jury resulted in a general verdict in favor of petitioners, and in special findings in which the jury found that Paul Anderson was possessed of testamentary capacity when he made and executed the will in question, but further found that certain provisions therein contained were procured through means of undue influence practiced upon him by his brothers aforesaid. The court sustained the special findings of the jury, and entered judgment revoking the probate of those portions of the will which the jurors found had been procured by means of undue influence, and upheld the decree admitting said will to probate in all other respects.

Heber Anderson as executor appeals, and he and John, individually, also appeal from that portion of the judgment revoking and setting aside the probate of said will. Numerous errors are assigned by appellants, but those relied on are in substance as follows:

(1) Error in overruling appellants' motion for nonsuit at the close of respondent's evidence; (2) error in refusing to charge the jury at the close of all the evidence that there was no evidence to sustain the finding that the will or any part thereof was procured by undue influence; (3) error in admitting and excluding evidence; (4) error in charging the jury, and in refusing to charge as requested by appellants; (5) error in rendering the judgment revoking in part the probate of the will; and (6) that there is no evidence in support of the verdict of the jury and its special finding upon the issue

of undue influence. Specifications wherein the evidence is insufficient to sustain the verdict and finding aforesaid were permitted to be filed by this court at the hearing.

In view that the jury specially found that the decedent was possessed of testimentary capacity when he executed the will in question, and since no one excepts to said finding, we must proceed to dispose of the appeal upon the basis that the decedent was of sound mind, or that he possessed the necessary mental capacity to make the will in question. The evidence upon that branch of the case will therefore be referred to only in so far as the same may be material and relevant upon the question of undue influence.

The evidence adduced by the petitioners is in substance as follows: Paul Anderson, the decedent, and Rose L. Anderson, one of the petitioners, were married in Salt Lake City, Utah, on October 5, 1907. She was then about twenty-two years of age, and he was some twelve years older. Paul was ailing at the time. A very short time after their marriage they moved to Clifton, Idaho, near which place Paul and his two brothers, Heber and John, owned a sheep ranch and quite a large number of sheep. Ray, the infant petitioner, was born on July 23, 1908, during which year Paul and his wife moved back to Utah, to obtain, as she says, better medical care for Paul, and from that time forward they lived at Murray, Salt Lake County, Utah. Paul was seriously afflicted with what is known as Bright's disease of the kidneys, or what the doctors called a form of chronic nephritis. He kept getting worse until in February, 1909, he had uræmic convulsions, which were produced by the accumulation of uræmic poison in his blood which his kidneys were unable to eliminate from his system. According to Mrs. Anderson's testimony, at about that time "Paul said that his memory was not so good as it used to be." She further testified that after their marriage, and up to the time he went to the hospital in May, 1909, he frequently suffered with severe headaches; that in the spring of 1909 she had a conversation with him "concerning the making of a will, and the fixing up of his property"; that he then said "it would be all right as

it was," and that he was not in favor of making a will; that in February, 1909, Paul was sick at his home, and he and the witness intended to go to California in the hope of benefiting his health; that a few days before they had intended to start Heber Anderson came down from Idaho to see Paul, and, in the language of the witness, Heber went into the room where Paul was, "and closed the door, and Heber was talking in a very harsh manner to Paul Anderson, but what was said I could not hear, because he closed the door after he had went into the room"; that when Heber came out of the room the sister of the witness asked him to remain for dinner, but he said, "No," that he was in a hurry, and the witness said that "he looked real angry"; that within a short time after Heber's visit he wrote a letter to Paul, which the witness, without Paul's knowledge, read; that in that letter, quoting from her memory, the witness said that Heber Wrote "that if Paul decided to go to any warmer climate that either Heber or John Anderson would go with him, as Heber believed they were the only ones that were interested in his welfare anyway, and he says, 'You shall not be neglected.' "

The witness further testified that after that she did not see either Heber or John until a considerable time after Paul had gone to the hospital for the purpose of having an operation performed; that he went to the hospital for that purpose on May 2, 1909, and the operation was performed on June 28th thereafter. She also testified that although she saw her husband on the day the will bears date, yet he did not inform her that he had made a will, and that she did not know that he had made one until after his death. It was also shown by other evidence that a few days before the doctors intended to perform an operation upon Paul, which they considered a serious one, Heber came to the hospital to see him; that Heber went to Mr. Marks, an attorney at law with whom he was acquainted, and requested Mr. Marks to go to the hospital to see Paul about making a will; that Mr. Marks said he could not spare the time to go to the hospital, but requested Heber to go and get memoranda or notes from Paul in which he should state the property, the devisees, and the disposition

he desired to make of his property, etc. Mr. Marks also says that he informed Heber that one-third of the property would go to the wife, as a matter of law, in which, owing to the character of the property, he was mistaken, but this is not material. Heber went to the hospital as directed, and on the same day returned to the office of Mr. Marks with the desired information. Mr. Marks then prepared what he calls a "rough draft" of the will, and requested Heber to go to the hospital and give it to Paul and have him suggest any changes he desired. Heber gave the draft aforesaid to Paul, and soon thereafter returned with it, and upon a separate sheet of paper also brought with him the changes Paul had indicated, which were very few and merely minor changes. Mr. Marks then prepared the will as proposed, and after doing so he and Heber again went to the hospital, and Marks then gave the proposed will as drawn to Paul, who read it over and suggested a change in his age from thirty seven to thirty six years. It appears that Paul was in bed at the time, and he and Mr. Marks were left alone in the room for about thirty minutes or longer, during which time Paul read or examined the proposed will. In the meantime Mr. Marks requested Heber to find some one who could witness the will with himself, and within the time aforesaid Heber returned to the room with Dr. Murphy, where Paul and Mr. Marks were waiting for them. Paul then declared the writing to be his last will and testament, and asked both the doctor, whom he knew quite well, and Mr. Marks to attest his signature by signing their names as witnesses to the will, which they did.

The will bears date on the 27th of June, 1909, and Paul was successfully operated upon the day following. A second operation was performed upon him about two weeks later, after which Paul improved in health somewhat and left the hospital some time in July and went to his home in Murray, and a short time thereafter went to Clifton, Idaho, from whence he returned in a bad condition, again went to the hospital, where he died in October 13, 1909. It was also shown that Mrs. Anderson, the petitioner, knew little or nothing concerning Paul's affairs or the value of his property;

that he did not discuss his affairs with her, but that when he and she lived at Clifton, Idaho, he and his brothers, Heber and John, would frequently discuss their business affairs among themselves, but not in the presence of the petitioner. It was also shown that Mrs. Anderson had no property when she married, and that she and Paul lived happily together. It further appears that Mr. Marks was paid for his services in preparing the will by a partnership check made and delivered by Heber Anderson. One of the doctors also testified that one afflicted with a disease such as Paul was afflicted with "might be influenced." It was also shown that the decedent left a personal estate worth about $9,900, and also owned a one-third interest in the sheep ranch in Idaho already referred to; but it was not shown how much the estate was worth after the payment of debts and necessary expenses of administration, etc.

The petitioners also produced the will in evidence, which so far as material here, is in substance as follows: The decedent directed that all of his property, except the specific devises, be converted into cash as soon as that could be conveniently done. He gave to Rose L. Anderson, his wife, one-third of all the property remaining after payment of debts and defraying the necessary expenses of administration, and in addition thereto she was given all household furniture and goods. Heber Anderson is given all the mining stocks and claims against mining companies. The infant son of the decedent is given $1,000 for care and maintenance, to be paid for that purpose at the rate of $6.25 per month to be paid from the date of testator's death until the full amount with interest is exhausted. Said infant son is given the further sum of $4,000, or, in case there is not that amount remaining in the estate, then the full amount remaining, which is to be paid to him when he arrives at the age of twenty one years. The testator directs that in the meantime the amount devised to said infant be invested at interest, which interest shall be used for the purpose of giving him a "college education in the schools of the State of Utah." It is also provided that no part of said interest shall be paid until said infant "shall have become regularly installed in a college course for col-

lege work in some one of the schools of the state of Utah which is then giving a complete college course; and it is my will that the interest that may have accumulated on said money by said time be divided into as many parts as there are months from said time until said son has arrived at the age of twenty-one years, and that one of each of said parts be paid each and every month thereafter for said education until he arrives at the age of twenty-one years, and that the interest that may accumulate after said enrollment shall be paid annually as it accumlates after said enrollment in such school each year thereafter after the enrollment of said son in such school." It is then further provided that in case said infant son shall die before he attains majority, without issue, "then what shall remain . . . shall go to my brothers, Heber Anderson and John Anderson, share and share alike." It is further provided that if said son shall die leaving issue, then what remains of his share "shall go to his issue." The remainder of the estate, if any, is to go to his two brothers aforesaid.

After producing substantially the foregoing evidence in support of the allegations contained in the petition, the petitioners rested, whereupon appellants interposed a motion for nonsuit upon the issue of undue influence for the reason that there was no evidence in support of that issue. The court denied the motion, and appellants offered evidence in answer to that adduced by the petitioners. We shall not attempt to do more than refer to those parts of appellants' evidence which were offered to explain the inferences which petitioners sought to draw from certain acts and circumstances, and we shall limit this statement of the evidence to such facts as were in no way questioned or disputed by the petitioners.

Referring to the making of the will, Heber Anderson testified that Paul requested him to come to Salt Lake City at the time he was in the hospital and intended to have the operation performed; that he came pursuant to said request; that he knew nothing about Paul's intention to make a will until informed by him, and that it was Paul who requested

him to see some attorney and send him to the hospital; that
Heber suggested Mr. Marks because he was acquainted with
him, and after he saw Marks he did what was done because
he was requested to do it by either Paul or Mr. Marks. He-
ber also says the check given to pay for Mr. Marks' services
was drawn by him at the request of Paul, and that the
amount thereof was charged to Paul's account upon the part-
nership books; that he made no suggestions to Paul about
his will; and that he only saw Paul once for a short time af-
ter he left the hospital and went to Idaho; that Heber ad-
vised Paul to go to Arizona because he knew that that was a
drier and warmer climate than California, and he thought
Paul would receive more benefit from a dry, warm climate
than from a damp one, such as the climate of California is in
winter.    The hospital physician, who attended Paul daily
during all the time that he was at the hospital, testified that
after Paul came to the hospital in May, 1909, and up to
June 28th following, the treatment received by him was
what is known as the eliminative treatment, which is in-
tended to eliminate the poison from the system which the
diseased kidneys fail to do; that Paul, on the 27th day of
June, 1909, when the will was executed, was in much better
physical and mental condition than he was when he came to
the hospital for treatment; that at that time his mental con-
dition was such that he could transact any ordinary busi-
ness; that when the will was signed by Paul he was mentally
sound, and, so far as the witness knew, labored under no
restraint whatever.    The testimony of Mr. Marks, so far as
Paul's mental condition and restraint is concerned, is to
the same effect.    Marks further testified that before the
will was signed by Paul the provisions made for the infant
son were fully discussed, and that Paul said that, in view that
he himself had not been able to obtain an education, he, so
far as he could, was desirous of making provisions for the
boy so he could acquire an education, and that he made that
provision in the will in that form so that the boy might
have money to go to school, and that when he got through
school he might have something left for a start in life.    It

also was made to appear without dispute that the mining stocks devised to Heber had been sold for assessments, and hence were entirely lost to the estate; that after the debts of the estate were paid, and Rose L. Anderson and the son's shares were taken out of same nothing remained; that the claims against the mining company referred to were absolutely worthless, and that the two brothers could obtain no part of the estate unless the infant son should die without issue before attaining the age of majority. It was also shown that for many years the three brothers were partners in the sheep business in Idaho; that Paul was the youngest of the three, and that owing to his delicate health for the last six or eight years preceding his death he was unable to rough it or to help very much in the business, and hence the two brothers, Heber and John, took care of Paul's interest for him. The acts and statements attributed to Heber, as testified to by Rose L. Anderson and others, were also either denied or explained by him, but as the jury had a right to believe the other witnesses as against Heber's statements we shall not refer to Heber's testimony further. We remark that there is not the slightest evidence in the record that John Anderson ever said anything to Paul or any one else about the will, nor that he even knew any was contemplated or made.

After adducing substantially the foregoing evidence upon the subjects we have referred to, both parties rested, and appellants offered two separate requests to charge the jury, which in substance are as follows:

(1) That there was no evidence adduced to sustain a finding that the decedent did not possess testamentary capacity when the will was made, and that the jury should return a verdict upon that issue in favor of appellants; and (2) that there was no evidence upon which to base a finding that the will or any part thereof was procured through undue influence, and that the jury should find that issue in favor of appellants. The court refused the foregoing requests. The jury having found that the decedent possessed testamentary

capacity at the time the will was made, that issue is out of the case.

We have attempted to set forth with as much particularity as is possible within the limits of an opinion all the salient facts that were produced in evidence by the petitioners against the will. Is there anything in what we have set forth that can be dignified by the name of evidence which in any way tends to show undue influence practiced upon the decedent, or from which it may legitimately be inferred that he was influenced to make any kind of a will by any one? Is it not beyond all peradventure of a doubt that whatever inferences are permissible from Heber's acts and conduct are just as likely to have emanated from pure brotherly motives to assist Paul as from motives bent upon influencing him in the disposition of his property in accordance with Heber's will? One is almost shocked by the assertion that the kindly offices of one brother to another, when the latter is in distress, may, without any tangible facts, be contorted into evidence showing sinister motives. If wills can be set aside by courts upon the ground of undue influence upon proof such as is presented in this case, then any will may be assailed in any case where the decedent was sick for any length of time, and was so situated that his immediate relatives were concerned in his welfare and made any attempts whatever to alleviate his suffering or to comply with his expressed wishes or requests. What is said that Heber did, or what is inferred he did, as shown by this record, cannot be tortured into evidence supporting the charge that he practiced undue influence upon Paul.

The Supreme Court of California, in a very recent case, in passing upon the question of what constitutes undue influence, and in holding that in that case there was no evidence of undue influence said:

"In the face of this showing, which we have set forth in mere outline, there is no basis for the claim that the will was procured to be made by the undue influence of the proponent. 'Undue influence, however used, must, in order to avoid a will, destroy the free agency of the testator at the time, and in the very act of the making of the testament. It must bear directly upon the testamentary act.'" *In re Higgin's Estate*, 156 Cal. 257, 104 Pac. 6.

To the same effect are:  *Carithers' Estate,* 156 Cal. 422, 105 Pac. 127; *In re Weber's Estate,* 15 Cal. App. 224, 114 Pac. 597; *In re Kilborn's Estate,* 162 Cal. 4, 120 Pac. 762

The foregoing cases are also directly in point upon the proposition that, where the evidence is as it is in the case at bar, it is the duty of the courts to uphold the will.  The Supreme Court of Kansas in a very recent case (*Ginter v. Ginter,* 79 Kan. 721, 101 Pac. 634, 22 L. R. A. [N. S.] 1024) lays down the rule in these words:

> "To vitiate a will there must be more than influence.  It must be undue influence.  To be classed as 'undue' influence it must place the testator in the attitude of saying, 'It is not my will, but I must do it.'  He must act under such coercion, compulsion, or constraint that his own free agency is destroyed.  The will or the provision assailed does not truly proceed from him.  He becomes the tutored instrument of a dominant mind, which dictates to him what he shall do, compels him to adopt its will instead of exercising his own, and by overcoming his power of resistance impels him to do what he would not have done had he been free from its control."

See, also, 1 Underhill on the Law of Wills, secs. 125, 128, 129, and 130.  The doctrine as laid down by the Supreme Court of California, as above indicated, is adopted and approved by this court in *Miller v. Livingstone,* 31 Utah, 415, 86 Pac. 338.  Upon this question it should always be remembered that no hard and fast rule can be laid down which shall control in every case.  Each case must, to a very large extent, be determined upon its own facts and circumstances, and in arriving at a conclusion the foregoing general rule should always be kept in mind.

Undue influence may be established without showing any physical coercion or constraint.  The influence that vitiates may be subtle and be entirely without outward demonstration, but in whatever form it may appear it must, nevertheless, be made to appear from competent evidence that the will of the one accused of practicing undue influence dominated the will of the testator—that the testament is in fact and effect the will of the accused and not that of the testator.  There is no evidence in this record from which any such deduction is permissible.

But it is suggested that the making of the will was concealed from the wife, with whom the testator lived happily. This, under the circumstances of this case, means absolutely nothing. See 1 Underhill, etc., sec. 131. There is not the slightest evidence that either Heber or John had anything to do with the concealment, if it was such, or that they even knew of it.

But it is urged that the will is unnatural in its provisions, and that the provisions for the infant son's support are wholly inadequate. It is further contended that the devise to the brothers is both unnatural and unjust. What is there that is either unnatural or unjust about that? It appears from the undisputed evidence that after the testator's debts are paid the widow is given all and a little more than all of the testator's property which he owned apart from his interest in the partnership assets. It is also shown beyond cavil that for a long term of years the testator was unable to do his portion of the work connected with the partnership affairs. It was his brothers, Heber and John, therefore, that cared for his interest. Suppose they, as many brothers have done, and as they might have done, had set Paul adrift because on account of his failing health he was unable to do his share of keeping the partnership on foot. What would have become of his interest? Rose L. Anderson says that practically during all of their married life Paul could perform no hard labor, and that during the last year or two he was practically unable to do anything. The two brothers, therefore, not only preserved what he had, but through their efforts added to what he had, if anything was added. Rose L. Anderson possessed no property at all, she says, when she married Paul, and all she now has was obtained from him. Under such circumstances why should not Paul feel under some obligations to his brothers? Wherein is such conduct on his part unnatural? We confess our inability to see it in that light.

Recurring now to the provisions made for the infant son. Let it be conceded, for the purposes of this decision, that the amount set apart for the support of the child, either before

entering or after he has entered the school spoken of in the will, is small, or even inadequate. Is that any reason why the court or jury may interfere with the parent's will? Does the law countenance interference with the will of a parent by court or jury when it denounces such interference by relatives and others? Apart from the motives involved, what is the difference between substituting the will of the court or jury for that of the testator and substituting the will of the brother for that of the testator? We confess that we can see no difference. In this case, in order to permit the verdict to stand, we must hold that it is proper to substitute the will and judgment of the jury for that of the father in making provision for his son's education and support during his minority. The judgment of the jury may be sounder and wiser than that of the father, but that is no reason whatever for substituting the judgment of the former for that of the latter. The law of this state gives "every person over the age of eighteen years, of sound mind," the right to dispose of his property by will as to him seems just and right. If this right may be invaded simply because a court or jury may not be able to agree with the testator in the manner he has disposed of his property, or because he has not made an adequate allowance for a specific purpose, then the right had better be abrogated entirely. The Legislature might do so, but courts cannot. We can discover no legal reason whatever for sustaining the finding of the jury that the provisions of the will set aside by them were procured through undue influence, or through any influence for that matter.

This case has been twice tried already. If no evidence has been produced to sustain the contentions of the petitioners on two trials, it is not likely that any can be produced upon a third trial. Moreover, the facts and circumstances surrounding the testator and the making of the will show that no other evidence than that which has already been produced can be obtained. It would therefore not only be needless, but a wasteful expenditure of the estate's funds to prolong this litigation. The estate should be preserved for the widow and the child and not wasted in needless litigation.

In view of the foregoing conclusions it is not necessary to pass upon the errors relating to the admission and exclusion of evidence and the alleged errors in the charge of the court and in refusing to charge as requested.

The judgment is reversed, and the cause is remanded to the district court of Salt Lake county, with directions to set aside the general verdict of the jury and the special findings made upon the issue of undue influence; to substitute therefor a finding that the will was not procured by undue influence, and make conclusions of law, and enter judgment sustaining the will and the probate thereof in all respects.

McCARTY, C. J., concurs.

STRAUP, J. (dissenting).

I think there is sufficient evidence to support the special findings and verdict, and for that reason dissent.