[Civ. No. 4326.  Third Appellate District.—December 19, 1930.]

In the Matter of the Estate of EMILIE V. BEMMERLY, Deceased. FREDERICK N. ABELE et al., Minors, etc., Appellants, v. MARY E. ABELE, Executrix, etc., et al., Respondents.

Huston, Huston & Huston for Appellants.

Gaddis & McDonald for Respondents.

MR. JUSTICE PLUMMER Delivered the Opinion of the Court.—This is an appeal by the above-named contestants from a judgment of the superior court in favor of the respondents based upon a directed verdict.

On the twenty-fifth day of August, 1928, Emilie V. Bemmerly, a resident of Yolo County, died in the city of Berkeley. On the seventeenth day of September, 1928, an order was made by the Superior Court of Yolo County admitting to probate a certain writing as the last will and testament of said deceased. On the tenth day of September, 1929, the appellants began an action to contest the admission of said writing to probate as the last will and testament of said deceased, and prayed judgment of the superior court revoking the probate thereof. Paragraph VI of the contest filed by the appellants reads as follows: "That at the time when said purported last will and testament was executed, the deceased was incompetent to make a last will and testament, and was not of sound and disposing mind or memory." It appears from the record that the cause was tried upon the issue of the soundness of mind of the testatrix. While the testimony set forth in the transcript appears to be practically overwhelming in support of the writing as the last will and testament of Emilie V. Bemmerly, and of her soundness of mind at the time of its execution, nevertheless, in view of the fact that the court directed the verdict, we will confine ourselves first to a consideration of the testimony introduced by the contestants, and that portion thereof which the contestants claim warranted sending the cause to the jury undirected, and will later give a general summary of the whole case.

Both contestants and respondents concede the law to be that the right of the court to direct a verdict is absolutely the same as the right of the court to grant a nonsuit, and that a nonsuit may only be granted, when disregarding conflicting evidence and giving to the con-

testants' evidence all the value to which it is legally entitled, indulging in every legitimate inference which may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the contestants, if such a verdict were returned. Following this statement, we will set forth what the contestants claim to be the substantial testimony of Adolph Abele, the father of the contestants and the guardian of the contestants in this action. This witness testified that in 1915 he married Miss Emilie V. Bemmerly, the daughter of the deceased. The issue of that marriage was a boy and girl, who appear as contestants herein; that Emilie V. Bemmerly died April 12, 1924; that whatever unfriendly relations had existed between the witness and Emilie V. Bemmerly, deceased, had all been smoothed out in 1924; that the witness had not remarried since the death of his wife Emilie; that the two children, the issue of said marriage, had frequently visited the deceased prior to her last illness; that the deceased was first taken to Providence Hospital some time during the month of June; that about a month before her death, the deceased was removed to the home of Mrs. Williams in Berkeley; that about the 1st of August, 1928, the witness visited the deceased at the home of Mrs. Williams, and had some conversation with her about a $150 check; that the next time the witness visited Mrs. Bemmerly was on August 14, 1928; that he arrived at the home of Mrs. Williams at about 3:30 P. M. What the evidence shows is best indicated by quoting the questions and answers: ''Q. In what condition did you find Mrs. Bemmerly at that time, as compared with the first of August? A. Very bad. Q. Well, just tell the jury what? A. Well, when I came in there she was all nervous and she wanted to go home, but she never spoke; she just said, 'I want to go home. I want to go home.' And Mrs. Williams said, 'Adolph is here.' And she said, 'I want to go home'; and her eyes were all bleary and never noticed me at all. Q. Did she call you by name? A. No. Q. And so far as you could tell she did not recognize you? A. No, she did not recognize me. Q. And did she carry on any conversation with you? A. No, sir. Q. And was she sitting up in bed? A. Yes. Q. And how long were you there on this last time on August 14th? A. Well, Mrs. Williams

got—told me to stay there until she got some of that there—they called it morphine at that time, but I heard afterwards it was strychnine. Q. Well, you don't know what it was she got, Mr. Abele? A. No; and then she quieted down and I went out. Q. Did you go in and see her again on the 14th? A. That evening, yes. Q. At what time in the evening? A. Oh, it must have been about 8 o'clock, I guess, right before bedtime. Q. And what was her condition then? A. Well, she was asleep there and I didn't say anything. Q. Did you have any conversation with her? A. No, sir. Q. She was simply asleep and nothing transpired? A. That is it. Q. Now, did you see her on the morning of the 15th? A. Yes, sir. Q. At about what time in the morning? A. Oh, it must have been about 8 o'clock, 8 or 9 o'clock. Q. Was she awake? A. She was awake; she was kind of moaning all the time. Q. And did she speak to you or recognize you? A. No. Q. Did you try to talk to her? A. Yes. Q. Did she answer you? A. No. Q. Did she give any indication of knowing that you were in the room? A. No. Q. Now, how long were you in the room on the morning of the 15th? A. Maybe five or ten minutes. Q. Did you see her again on the 15th? A. About 8 o'clock. Q. And what was her condition at that time? A. She did not know me. Q. The same as it was on the other visit? A. On the 14th, yes. Q. Did you see her on the 16th? A. Yes, sir. Q. About what time in the morning? A. I saw her about 9 o'clock. Q. When you left in the afternoon of the 16th about 3:30, did you see Mrs. Bemmerly? A. Yes, sir. Q. How long were you in the room? A. I was in there for five minutes. Q. And did you try to talk to her? A. There was no use; she was asleep. Q. Now, I will ask you, Mr. Abele, whether or not, on these occasions that you have mentioned, on the 14th, 15th and 16th, and the 19th and 20th, Mrs. Bemmerly was, in your opinion, a person of sound or unsound mind? A. Unsound mind." The testimony as to the 19th and 20th shows that the deceased was apparently asleep at the times when the witness was in her room. The testimony of this witness, as set out in the transcript, was repeated several times, but what we have stated is all that the testimony shows, and the direct and cross-examination, though it covered the ground several times, affected no material change.

Preceding the introduction of the testimony of this witness, the contestants placed upon the stand other witnesses whose testimony did not relate to the mental condition of the deceased, and then offered the deposition of Mrs. Amelia Abele Williams, a niece of the testatrix, a professional nurse, and who acted as nurse for the deceased during her last illness. This witness testified that Mrs. Bemmerly was taken to the Providence Hospital some time in June, 1928, and left the hospital on or about July 19, 1928; that she was brought to the home of the witness and remained there until the time of her death; that she was brought there in a taxi; that for about a week after the deceased came to the home of the witness, deceased was up and around. About a week after the arrival of Mrs. Bemmerly from the hospital the doctor ordered her to bed, and that thereafter she remained in bed until the time of her death; that the deceased was suffering from heart trouble; that the attacks would last no longer than half an hour; that the deceased was given digitalis, a heart stimulant, and in the evening, one-eighth of a grain of morphine, as a sleeping potion; also, that the deceased was given cremo carbonates, a medicine for the stomach; that the morphine was administered nightly in order to induce sleep; the dose was usually given about midnight; the digitalis was administered about every four hours; that the digitalis did not have any effect save and except to stimulate heart action; that the deceased was able to feed herself until a few days before her death; that the deceased had orders to remain quiet; that they kept the deceased in a sitting position in bed; that the deceased read the newspapers, including the home papers, up until a few days preceding her death; that the deceased gradually became physically weaker; that there was a marked change two or three days before her death, which took place on the twenty-fifth day of August, 1928. This witness also testified that Mrs. Bemmerly asked that a priest be called, and that a priest called on the 13th, and again on a later date. The witness also testified that Mrs. Bemmerly desired to be taken to her home in Woodland, and that on the evening of the 13th she called up Adolph Abele upon the phone, and that he came to the home of the witness on the 14th of August. The witness then described an attack which the deceased suffered on the 14th, and the testimony continued as follows: ''Q. And what about the

severity of that attack as compared with previous attacks? A. That was about the same. Q. Well, how did it leave her? A. It left her—when the doctor called that morning, I forget now whether the 14th or 15th—he warned us and advised us that he would not guarantee her heart to stand the trip to Woodland. Q. Now, returning to the 14th, the day that she had the attack, after you received the telephone from Adolph, how long did that attack last? A. Just about the same period—a slight attack. Q. And did you administer any morphine during that attack? A. That was in the morning; no, I didn't. Q. Then, as I understand you, according to your recollection she had no opiate between the night of the 13th and the night of the 14th? A. Only at night; only at her bedtime. Q. Now, you were there when Adolph arrived? A. Yes, sir. Q. And did Adolph go in the room and see her after he arrived? A. Yes. Q. Were you in the room at any time Adolph Abele and your aunt, Mrs. Bemmerly, the three of you together? A. Well, I can't recall, but we must have been together because I was the nurse. Q. Do you know what your aunt's condition was at the time Adolph arrived, with reference to being conscious or unconscious? A. She was conscious. Q. What was her condition with reference to being weak? A. She was weak. Q. Was she asleep when he arrived? A. I don't remember. Q. Do you know whether or not she recognized him when he arrived? A. I don't remember, but she must have; she was conscious. Q. Have you any recollection of being in the room with your aunt on the 14th, at the time Mr. Adolph Abele was present? A. I do not. Q. How many times did Mr. Abele see her on the 14th? A. I don't remember. Q. What was her condition on the night of the 14th, when you administered the morphine? A. Her usual condition. Q. Did Adolph spend the night in your home? A. Yes, sir. Q. Now, on the 15th, what was your aunt's condition? A. She was very bright. Q. Did you have any conversation with your aunt in the presence of Adolph, about going to Woodland? A. I don't recall. Q. Do you recall any conversation you had in the presence of your aunt, when Adolph Abele and yourself were present on the 15th? A. I do not recall any conversation. Q. And your aunt was better on the morning of the 15th? A. I did not say 'better'; I said 'bright'. Q. What was the difference in her con-

dition with reference to brightness, when she was in one of those attacks? A. She was exhausted-like.''

This witness further testified that up until three days before the death of the deceased, she was rational, and that her mind was all right; that her physical condition was getting weaker.

The witness Bertha Keehn testified that she went to the room of Mrs. Bemmerly on the 19th of August, and that at the time she went to the room Mrs. Bemmerly was asleep; that no conversation was had with Mrs. Bemmerly on account of the fact that she was sleeping.

The facts as disclosed by the record are substantially as follows: That the testatrix was taken ill on or about the tenth day of June, 1928. In about a week thereafter she was taken to the Providence Hospital at Oakland, and remained there until the 19th of July, when her condition being much improved, she was brought to the home of Mrs. Williams at Berkeley; that Mrs. Bemmerly was up and around the house at this place for about one week, when she suffered a relapse and was ordered to her bed. She remained in bed from that time until her death, which occurred on August 25, 1928. Heart attacks continued at irregular intervals until the time of her death, lasting from half an hour to 45 minutes. She was kept, most of the time, in a sitting position. The deceased was given digitalis every four hours, and one-eighth of a grain of morphine every evening. During the time Mrs. Bemmerly remained at Berkeley she was nursed by Mrs. Williams, a graduate nurse. After being ordered to bed, there was no material change in the condition of Mrs. Bemmerly until about the 19th of August. The deceased did not lose consciousness at any time until three days before her death. The deceased received visitors, read her home papers, and was able to converse with her relatives who called upon her. On the 13th of August, she asked to see a priest, who called upon her that day. On the 13th she asked to be taken to her home in Woodland, and Adolph Abele was telephoned to come and take her. Adolph Abele arrived at the Williams' home about 3 o'clock in the afternoon of August 14th. Mrs. Bemmerly was nervous and said she wanted to go home; did not say anything else except that she wanted to go home. While Adolph Abele was present on the afternoon of the 14th, Mrs. Williams administered to the testatrix

a hypodermic of digitalis; the testatrix then quieted down. Abele did not see her any more that day until just before bedtime, about 8 o'clock. The testatrix was asleep, and Adolph Abele had no conversation with her. He saw her again on the morning of the 15th, about 8 o'clock, for five or ten minutes; she was awake and moaning; did not speak to, or recognize him. Abele saw her for five or ten minutes on the night of August 15th, at which time she was asleep, and he did not disturb her. Abele saw her again on August 16th, in the morning; the deceased was asleep at that time. On the morning of the 16th, after Adolph Abele had departed for Oakland, the testatrix asked Mrs. Williams to tell Mrs. Abele to get some papers and a pencil and come up to her room, as she wanted to make a will. This request was complied with. When Mrs. Abele arrived at the bedside of the testatrix she informed testatrix that she could not do anything without a lawyer, and asked her if she would like to have Mr. Gaddis, who was then believed to be at San Rafael. The testatrix replied that she would like to have him. An attempt was made to communicate with Mr. Gaddis. In the meantime the testatrix requested Mrs. Abele to take down on some paper, items with regard to her property. The testatrix indicated her real property and certain bequests that she wished to be made. Mrs. Abele made this memorandum at about noontime on August 16th. At about noontime Dr. Cheney arrived, and communication not having been made with Mr. Gaddis, Dr. Cheney arranged to have Mr. Sutliffe call at the Williams' home. Mr. Sutliffe arrived at about 4 o'clock in the afternoon of August 16th. Mr. Sutliffe was introduced to the testatrix, discussed the items with the testatrix, contained in the memorandum made by Mrs. Abele, got the boundaries of her lands from the testatrix, and discussed with her, her personal property, and the bequests she desired to make. Mr. Sutliffe then drew up a will in lead pencil, which was executed by the testatrix and witnessed by Mrs. Abele and himself. Mr. Sutliffe then stated that he would take the will with him and put it in typewritten form and return the next day and have it executed in typewritten form. Mr. Sutliffe returned with the typewritten will on the 17th, and the typewritten will was then executed.

█ During the time we have covered by the testimony, it appears that the deceased had one or two attacks of what the witnesses called "hysterics". In addition, a great deal of testimony appears in the transcript, as we have stated, showing the competency of the testatrix, and the soundness of her mind at the time of the execution of the will on the 17th of August. There is no testimony tending to show that the testatrix was not, on the 17th of August, 1928, conscious, nor any testimony tending to show that she did not fully understand what she was doing, and the disposition she was making of her property.

█ The contestants further asserted that the will admitted to probate is unnatural, and in support of this contention, make the following statement: "By the terms of the will she divided a tract of land in Yolo County consisting of 120 acres, by devising 80 acres to her grandchildren, and 40 acres to the two nieces mentioned. After making cash bequests aggregating $2,100, the residuum of the estate was equally divided between the two grandchildren and these same two nieces. Thus the share of the estate taken by the grandchildren only exceeds that of the nieces to the extent of 40 acres of land. According to the value of the land as fixed by the appraisement, these grandchildren received only $10,000.00 more than the nieces. The evidence is silent as to any reason why the testatrix so preferred and favored the two nieces." And in support of their contention, the contestants introduced in evidence a will which was executed by the deceased on September 4, 1924, and thereafter destroyed. We think this will in itself is a sufficient answer to the claim of unnaturalness. In the third clause of the will of 1924 we find the following: "I declare that my two grandchildren named Frederick Bemmerly Abele and Mary Elizabeth Abele having received their share of their mother's estate in land, at the time of her death, I do now give, devise and bequeath to them, in equal shares, share and share alike, all moneys and property belonging to me at the time of my death, not herein otherwise disposed of and not disposed of by and through the deeds of gift above referred to."

In the same will, the cousins, Christ Gumbinger and Charles Schnerly, were bequeathed a promissory note which was owed by them to the deceased. To Bertha Mary Keehn was bequeathed all the contents of her residence,

including furniture, carpets, etc. In the second paragraph of the will the deceased declared that at the date of making the same, she made, executed and delivered into the custody of E. E. Gaddis deeds of gift of all her real estate, with directions to deliver the same to the grantees named therein upon her death. This instrument shows that the testatrix did not, in 1924, at a time when there was no question made as to her competence, intend that the contestants in this action should receive all of her estate. The record does not show to whom the deeds were executed. The will under consideration' gives 80 acres of land to the two grandchildren, 40 acres of land to two nieces, and among the bequests $300 is given to Christ Gumbinger and $300 to John Gumbinger, persons who are named in the will of 1924; and then, in the residuary clause, the estate was to be divided between Frederick Bemmerly Abele, a grandson, and Mary Elizabeth Abele, a granddaughter, the contestants herein, and Bertha Abele Keehn and Amelia Abele Williams, nieces.

It appears that the deceased had other nieces who were unmentioned in the will of 1924, and also were unmentioned in the will under consideration.

No attempt is made in this case to prove any hallucinations or delusions on the part of the deceased, or anything in the record indicating undue influence or influence of any kind whatsoever. ■ The law is well settled in this state that a testator is of sound and disposing mind and memory, if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recall the nature and situation of his property, and to remember and understand his relations to the persons who have claims upon his bounty, and whose interests are affected by the provisions of the instrument.

■ The testimony of Adolph Abele that he visited the room of the testatrix three times while the testatrix was asleep, once when she was drowsy and another time when the testatrix was suffering from a heart attack, moaning and saying she wanted to go home, is in fact, when analyzed, no evidence whatever of unsoundness of mind, and the witness' opinion of the unsoundness of mind of the testatrix, based upon such premises, does not rise to the dignity of what is called a "scintilla" of evidence. To hold that

such testimony is sufficient upon which to set aside the execution of a solemn instrument would be tantamount to the repealing of the probate law relating to the execution of wills. The two wills, executed four years apart, show that the testatrix had in mind the contestants in this action, and that she never intended to give them all of her property, as shown by the instrument introduced in evidence by the contestants.

Upon the record it is clear that had the cause been submitted to the jury, and the jury returned a verdict in favor of contestants, it would have been the duty of the trial court to set such verdict aside, and upon the long list of cases contained in the California Reports, if such verdict had not been set aside, it would be the duty of an appellate court so to do.

An analysis of the cases having to do with will contests would add nothing to the legal literature of this state which has not already been fully covered. For this reason we content ourselves with the foregoing summary of the facts.

Finding nothing in the record which would justify a verdict in favor of the contestants, it follows that the judgment of the trial court must be, and the same is hereby affirmed.