[S. F. No. 14681. In Bank.—May 3, 1935.]

In the Matter of the Estate of HENRY C. FINKLER, Deceased. CHRISTINA A. FINKLER, Appellant, v. M. J. PURCELL et al., Respondents.

SUMNER J. WAITE et al., Appellants, v. M. J. PURCELL et al., Respondents.

Henry Eickhoff, Henry Eickhoff, Jr., George W. Wilson, J. E. McCurdy, F. J. Kilmartin and Knight, Boland & Riordan for Appellants.

Ross & Ross for Respondents.

PRESTON, J.—This record presents two main questions for consideration: First, that of the validity of the testamentary attempt of Henry C. Finkler, deceased, involving a claim of insanity and undue influence, and, second, that of proper construction of the instrument in case its probate is declared valid.

The decedent was for some fifty-two years a loyal attaché of this court, serving it in various capacities and particularly as its senior secretary. This latter work was performed until the day next prior to his tragic death. The record shows that the work performed by him required care, accuracy, diligence, judgment and discretion; that he was in daily contact with the justices of the court and also in almost constant communication with the Chief Justice; that his ability to function and to carry on his duties was under the daily observation of his cosecretary and the court; that the business of the court also brought him in daily communication with the publisher of the legal paper known as "The Recorder," which published the opinions of the court; that he was too, of necessity, in daily communication with the clerk of this court, who was made a beneficiary under his last will and testament. The testimony adduced also shows him to have been a well-known character in court circles. In fact, in 1928, at the instance of prominent members of the bar, his faithful and efficient public service was recognized by an appropriate public ceremony in the courtroom of this court in the state building, which ceremony he attended and, to the laudatory remarks made of him, gave appropriate public response. Witnesses in all the above-mentioned relationships gave convincing testimony of

his sanity up to a period of within two weeks next prior to his death.

Yet, notwithstanding these facts, several lay witnesses testified that in their opinion the testator was of unsound mind and they all stated that in their opinion this condition had obtained for many years, some of them going back as far as fourteen years next prior to his death. No witness, however, attempted to say that he was so low in mentality that he could not transact business of every kind. In fact, in addition to the work of the court, he was in the summer of 1930, next following the execution of his will, an efficient and active fire commissioner of the Emerald Lake fire district. The evidence respecting the alleged insanity relates almost exclusively to certain delusions possessed by the testator but no one of said delusions was shown to be such as would or could affect the testamentary disposition of his property.

The judgment of the court below upheld the document in question as the last will and testament of said decedent. Contestants then appealed to this court. The cause was transferred to the Fourth Appellate District for decision and, again on petition of contestants, was later transferred to this court. So much of the opinion of the District Court of Appeal as disposes of the question of insanity and undue influence, we hereby adopt as part of this opinion, same being as follows, to wit:

"The decedent, Henry C. Finkler, died November 18, 1930, by suicide. A document, in form a holographic will, bearing date of April 21, 1930, was in due time presented to the probate court as the last will and testament of said deceased. By said will decedent named as sole beneficiaries thereunder, M. J. Purcell, the husband of a niece of decedent's predeceased spouse, and B. Grant Taylor. Mr. Finkler left as his only heirs at law, Christina Finkler, a half-sister and Sumner J. Waite, Emmett Brophy, Edith F. Stewart, Aurelia Hanlan and Bernice Macaire, nephews and nieces of Aileen Finkler, predeceased wife of Henry C. Finkler, contestants herein, and Aileen Purcell, a niece of Aileen Finkler, who is the wife of respondent M. J. Purcell.

"A contest was filed by Christina A. Finkler, a half-sister of the deceased, who based her action upon the following grounds, to-wit: (1) That at the time the deceased

executed the will in question he was not mentally competent to make a will. (2) That the said will was procured and executed under the undue influence of M. J. Purcell. (3) Incompleteness of the will.

"Subsequently a like contest was filed by Sumner J. Waite, Emmett Brophy, Edith F. Stewart, Aurelia Hanlan and Bernice Macaire upon similar grounds, except that they did not allege undue influence. The contest went to trial before the court with a jury and at the conclusion of contestants' case a motion for nonsuit was made upon the grounds of insufficiency of the evidence, which motion was denied by the court. At the close of the trial proponents moved for a directed verdict on the ground of insufficiency of the evidence. The court denied the motion. The special issues of incompetency and undue influence were thereupon submitted to the jury for decision, the other issues being reserved for the court. The jury returned a verdict finding: (1) That at the time of the execution of the purported will dated April 21, 1930, the decedent Henry C. Finkler was of unsound mind, and (2) that the said purported will dated April 21, 1930, was procured through the undue influence of M. J. Purcell. Thereupon the proponents moved for a judgment notwithstanding the verdict, which was granted. In addition the court ruled against the contestants on the remainder of the issues and the will was admitted to probate. From this judgment the contestants have appealed. Separate briefs have been filed by the two groups of contestants.

"Appellant Christina Finkler attacks the judgment admitting the will to probate on the grounds: (1) The court erred in granting proponents a judgment notwithstanding the jury's verdict that decedent was of unsound mind at the time of the execution of the will, and that it was procured through undue influence; and (2) Assuming the document to be a will all the alterations, interlineations, cancellations and additions thereto are valid and must be given effect. Appellant Sumner J. Waite and his cousins in their brief attack the judgment on the second ground alone, and also allege that there was a revocation of the devise of the realty. By section 629 of the Code of Civil Procedure, enacted in 1923, it is provided that 'when a motion for a directed verdict, which should have been granted, has been

denied and a verdict rendered against the moving party, the court, at any time before the entry of judgment, either of its own motion or on motion of the aggrieved party, shall render judgment in favor of the aggrieved party notwithstanding the verdict. . . . '

■ "Both contestants and respondents concede the law to be that the right of the court to render a judgment notwithstanding the verdict is the same as the right of the court to grant a nonsuit or direct a verdict, and that a nonsuit may be granted or a directed verdict ordered when, disregarding conflicting evidence, and giving to the contestants' evidence all the value to which it is legally entitled, indulging in every legitimate inference that may be drawn therefrom, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of contestants if such a verdict were returned.

"In *Estate of Sharon*, 179 Cal. 447, at page 459 [177 Pac. 283], the court says:

" 'It is a settled rule of law regarding trials by jury that in a proper case the court has full power to direct the jury to render a verdict. This power exists in favor of the defendant where there is no substantial evidence tending to prove all the controverted facts necessary to establish the plaintiff's case. It is not necessary that there should be an absence of conflict in the evidence. To deprive the court of the right to exercise this power, if there be a conflict, it must be a substantial one.'

"There are numerous decisions to this effect. We cite the following cases: *Estate of Baldwin*, 162 Cal. 471, 473 [123 Pac. 267]; *Sill* v. *Ceschi*, 167 Cal. 698, 704, 706 [140 Pac. 949]; *Estate of Caspar*, 172 Cal. 147 [155 Pac. 631]; *Jacobson* v. *Northwestern etc. Co.*, 175 Cal. 468, 473 [166 Pac. 3]; *Perera* v. *Panama P. I. E. Co.*, 179 Cal. 63 [175 Pac. 454].

"In *Estate of Hamburger*, 126 Cal. App. 455 [14 Pac. (2d) 802], one of the more recent cases upon the subject, the court says:

" 'Without here attempting to draw a fine technical definition of a nonsuit and without trying to harmonize the several leading cases upon the subject (and we confess that there are statements in the opinion in *Estate of Ivey*, 94 Cal. App. 576 [271 Pac. 559], with which we do not entirely

agree), we think the following expresses the problem before us, in so far as the question of mental incapacity is concerned: Is there any substantial testimony that decedent was so mentally incapacitated on the 18th day of August, 1930, that he could not have understood the contents of the document which he signed on that day as his last will and testament. . . . ?'

"The first question then that presents itself to this court for consideration and determination is: Is there any substantial testimony that decedent, Henry C. Finkler, was so mentally incapacitated on the 21st day of April, 1930, that he did not have testamentary capacity?

"The estate involved is of the value of approximately $54,659, and consists of 182 acres of land near Redwood City in San Mateo county, valued at $40,000; real estate in San Francisco county valued at $1,000; personal property and jewelry valued at $500, and cash in the bank valued at $13,159.

"It appears from the record in this case that Mr. Finkler had been secretary of the Supreme Court of the state of California for more than 50 years prior to his death; that he was acting as such secretary when he drew the will in question here and up to the very night before he committed suicide; that he lived on a ranch near Redwood City; that during the summer of 1930, at the time of making the will, and subsequent thereto, he was a fire commissioner of the Emerald Lake Fire District. The deceased, at the time of his death, was 72 years old. His mother was born in Mexico and at the time of her marriage had two daughters by a former marriage, Christina and Clara, both of whom took the Finkler name; the decedent's father committed suicide in the seventies. During her lifetime the decedent's mother had twice been committed to an asylum by reason of insanity. Likewise the deceased's half-sister, Clara, had been adjudged insane and committed to an institution.

"From this pathological background we will now proceed to examine the testimony adduced at the trial necessary to the consideration of the case.

"Various witnesses were called by appellant and testified. To set out at length the testimony of each individual witness would add nothing to the legal literature of this state. Hence, we shall confine ourselves to a general summary of

the facts as they appear from the testimony of the various witnesses as set forth in appellant's brief.

"The evidence shows that decedent was building an airplane in the attic of his home at Redwood City; he spoke of a tunnel which ran from the hill on his property to Lake Merced; he had several loaded guns around his house; he failed to recognize and speak to acquaintances at various times; he considered his Redwood City property very valuable; he watched the delinquent tax sales; he thought he could obtain bargains at such sales; he was cruel to dumb animals; he claimed supernatural powers; and he thought there was a valuable water supply on his San Mateo county property.

"While some of the testimony introduced by appellant tends to show a mental weakness and indicates beyond question that the deceased had delusions at various times during the latter years of his life, and also that in many ways he was peculiar and that during many years he was eccentric in some respects, yet all of such testimony should be read in the light of the opinion in *Estate of Bemmerly,* 110 Cal. App. 550, 560 [294 Pac. 33]: 'The law is well settled in this state that a testator is of sound and disposing mind and memory, if, at the time of making his will, he has sufficient mental capacity to be able to understand the nature of the act he is doing, and to understand and recall the nature and situation of his property, and to remember and understand his relations to the persons who have claims upon his bounty, and whose interests are affected by the provisions of the instrument.'

"In the *Estate of Casarotti,* 184 Cal. 73, 80 [192 Pac. 1085], the court says: 'It must be borne in mind that it is not every weakness and impairment of the faculties of the testator that will invalidate a will. Even where a testator is feeble in health, suffering under disease and aged and infirm, yet if he was of sufficiently sound mind to be capable of understanding the nature and situation of his property, and of disposing thereof intelligently, without any delusions affecting his action, he had sufficient capacity to make a will. (*Estate of Motz,* 136 Cal. 558 [69 Pac. 294]; *Estate of Purcell,* 164 Cal. 300 [128 Pac. 932]; *Estate of Huston,* 163 Cal. 166 [124 Pac. 852]; *Estate of Weber,* 15 Cal. App. 224 [114 Pac. 597].)'

■ "It is quite significant that none of the contestants' witnesses testified in any way whatsoever as to Mr. Finkler being unable to understand business transactions or being unable to understand or recollect the nature of his property or his relation to his half-sister and the nieces and nephews of his deceased wife. It is further significant that no witness for contestants gave any reason for his opinion as to the sanity of the testator sufficient to sustain that opinion. A factor of great importance involving will contests is to be found in the proof as to the decedent's business ability. As a matter of fact the propounded instrument is usually sustained where it appears that the decedent was capable of directing business affairs (26 Cal. Jur. 674; *Huyck* v. *Rennie*, 151 Cal. 411 [90 Pac. 929]).

■ "In the *Estate of Redfield*, 116 Cal. 637, at page 655 [48 Pac. 794], the court approves a quotation from the prerogative court of New Jersey, as follows: ' "The abstract opinion of any witness, medical or of any other profession, is not of any importance. No judicial tribunal would be justified in deciding against the capacity of a testator upon the mere opinion of witnesses however numerous or respectable. A man may be of unsound mind, and his whole neighborhood may declare him so. But whether that unsoundness amounts to incapacity for a discharge of the important duty of making a final disposal of his property, is a question which the court must determine upon its own responsibility. It . . . is to be ascertained by the court by the application of certain rules of law in the exercise of a sound discretion regulated by these rules. The opinion of a witness must be brought to the test of facts, that the court may judge what estimate the opinion is entitled to. It is proper and legal to ask a witness his opinion as to the mental capacity of the individual to discharge the duty in question. The court will judge of . . . the proper weight to be given to his opinion from the facts and circumstances upon which he founds his opinion." (*Stackhouse* v. *Horton*, 15 N. J. Eq. 202, *supra*.) '

■ "In the *Estate of Chevallier*, 159 Cal. 161, 168–9, [113 Pac. 130], the court says: 'In considering the evidence it is important, preliminarily, to observe that it is not every form of insanity, not every mental departure from the normal, which destroys an otherwise valid testamentary act.. The rule of law is not that no person who is insane

may make a valid will, but that the will of no person who, by reason of insanity, is incapable of making valid testamentary disposition shall be upheld. Thus the wills of aged and infirm people, of people sick in mind as well as in body, are always upheld, if, notwithstanding their enfeeblement, testamentary capacity is shown. ■ So, again, it may be well and perhaps soundly reasoned that all persons who commit crime and that all persons who commit suicide are aberrant, abnormal, and therefore insane. But such is not the insanity which the law has in mind. It must be an insanity of one of two forms, either insanity of such broad character as to establish mental incompetency generally, or some specific and narrower form of insanity, under which the testator is the victim of some hallucination or delusion. And, even in the latter class of cases, it would not be sufficient merely to establish that a testator was the victim of some hallucination or delusion to avoid the will. The evidence must go further and establish that the will itself was the creature or product of such hallucination or delusion, or, in other words, that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. It would thus not be sufficient, to avoid a will, to show that the testator believed that the moon was made of green cheese, but if it should be established, in addition thereto, that because of this belief he devised or bequeathed his property in a way which, saving for the belief, he would not have done, a case is presented where the abnormality of mind has a direct influence upon the testamentary act.'

■ "In *Estate of Perkins*, 195 Cal. 699, 703 [235 Pac. 45], the court says: 'It is well settled that, upon the contest of a will on the ground that the deceased was of unsound mind, the actual mental condition of the testatrix *at the time of the execution of the will* is the question to be determined. (Citing cases.) Evidence as to the mental condition before or after the execution of the will is important only in so far as it tends to show mental condition at the time of the execution of the will. ■ The presumption is always that a person is sane, and the burden is always upon the contestants of the will to show affirmatively, and by a preponderance of the evidence, that the testatrix was of unsound mind at the time of the execution of the will. (Citing cases.) Insanity exists as a matter of law only from the time it is shown to exist and proof of subse-

quent insanity will not create nor carry a presumption of its past existence (*Estate of Dolbeer, supra* [149 Cal. 227, 86 Pac. 695, 9 Ann. Cas. 795]).

" 'Every mental departure from the normal will not destroy a testamentary disposition, otherwise valid, of the testatrix' estate. It is not the rule of law that no person who is insane may make a valid will. The real rule is that the will of a person, who by reason of insanity is incapable of making valid testamentary disposition of his estate, shall not be upheld (*Estate of Chevallier*, 159 Cal. 161 [113 Pac. 130]; *Estate of Wasserman*, 170 Cal. 101 [148 Pac. 931]).

" 'Mental derangement sufficient to invalidate a will must be insanity in one of two forms: (1) insanity of such broad character as to establish mental incompetency generally, or (2) some specific and narrower form of insanity under which the testator is the victim of some hallucination or delusion. Even in the latter class of cases, it is not sufficient merely to establish that a testator was the victim of some hallucination or delusion. The evidence must establish that the will itself was a creature or product of such hallucination or delusion; that the hallucination or delusion bore directly upon and influenced the creation and terms of the testamentary instrument. The evidence must establish in addition to the fact of the existence of the hallucinations or delusions the fact that by reason of these hallucinations or delusions the testatrix devised or bequeathed her property in a way which, except for the existence of such delusions, she would not have done. In short, the abnormality of mind must have had a direct influence upon the testamentary act (*Estate of Chevallier, supra; Estate of Collins*, 174 Cal. 663, 670 [164 Pac. 1110]; *Estate of Redfield*, 116 Cal. 637 [48 Pac. 794]; *Estate of Casarotti*, 184 Cal. 73 [192 Pac. 1085]).'

"In addition to the testimony that appellants have directed to our attention, we have searched the entire record and have failed to find any substantial evidence that indicates that any delusions existed in the mind of the decedent the day he executed his will or that any delusions affected in any manner his testamentary capacity. Such being the state of the evidence and applying the principles of law above set forth to the instant case, the conclusion is inescapable that the contestants failed to sustain the burden of establishing the fact that at the time of the execution

of the will, to-wit, April 21, 1930, the testator was so mentally incapacitated that he did not have testamentary capacity. From the evidence it appears to us that the testator was affected with some of the idiosyncrasies, peculiarities and eccentricities of life but that they were induced by his mode of living and by advanced age, and the evidence taken as a whole merely proves that at the time of his death his mental and physical powers were waning.

"We conclude that there is an utter failure of any evidence showing that either the delusions or eccentricities described showed that the decedent did not possess testamentary capacity at the time he executed his will.

"Appellants contend that the will is unjust, because it omitted from its provisions the natural objects of his bounty, the contestants herein. The contestants, referred to as 'his nieces and nephews', are admittedly unrelated to the testator, but are descendants of deceased brothers and sisters of Aileen Finkler, the testator's predeceased spouse. They are heirs at law of the testator, but are not the natural objects of his bounty.

"The remaining contestant, Christina Finkler, testified that 'We have been estranged for many years. Just why I do not know.' That she never had at any time visited his home in Redwood City until after his death; that she came down to see his remains.

"Mrs. Purcell testified regarding appellant Christina Finkler that 'she had done nothing to assist in the care of her mother during her declining years'. After his wife's death she had declined to join decedent or share his home or relieve his loneliness.

"Nellie Lewis, a lifelong friend of Finkler's, testified that Mr. Finkler showed her his will a week or two after he had drawn it; that he told her he would not leave Mrs. Finkler's people anything; that he was very bitter toward Christina Finkler, and that he didn't want to remember her at all.

"B. Grant Taylor testified that decedent showed him the will and said 'I have decided that the best thing I can do with my property is to leave it to you and Mike Purcell. You have four children and Mike has six and it will be very helpful to you.' Mr. Taylor also testified as to Mr. Finkler again showing him the will while they were passengers on a boat to Sacramento to attend a session of the

Supreme Court and of his preparing a rough form of will for Mr. Finkler and of inserting a provision therein for Christina Finkler. 'Q. Who suggested Christina's name? A. I did. Q. You thought it would be a good idea to provide for her? A. I felt that being a sister it would be proper for him to provide for her.'

"The evidence clearly shows that decedent and appellant Christina Finkler were estranged and had very little to do with one another. The estrangement appearing in evidence, the omission to remember her does not make the will an unnatural one. (*Estate of Kaufman*, 117 Cal. 288 [49 Pac. 192, 59 Am. St. Rep. 179]; *Estate of Lavinburg*, 161 Cal. 536 [119 Pac. 915]; *Estate of Morcel*, 162 Cal. 188 [121 Pac. 733].)

"As to the other contestants, the nieces and nephews of Mr. Finkler's deceased wife, they were in no sense legally or morally the natural objects of his bounty.

"2. It seems to us also that the evidence is entirely lacking as to the alleged undue influence of M. J. Purcell. A summary of the testimony indicates that after decedent's wife died Mr. and Mrs. Purcell visited decedent at his home in San Mateo county; that their relations were friendly; that decedent had openly expressed his admiration for Purcell and love for the Purcell children.

"In regard to the execution of the will Mr. Purcell testified that he saw Mr. Finkler on the 21st day of April, 1930, at his place of business at 404 Sutter street and Finkler said he had been to the dentist and the dentist suggested extracting two teeth which he thought was a pretty good idea since they were sore. Mr. Finkler said he had not made any will and that he decided he would make his will before he had that work done, as he realized if he died he would die intestate. He told Purcell that the dentist had injected novocaine. Purcell further testified that he had made no suggestion at the time with reference to making a will; that he gave decedent a piece of paper and pen to write with, but that decedent had requested the articles of him; that Mr. Finkler specifically asked Purcell for a piece of paper without any printing on it and said: 'Before I have these teeth extracted I want to make my will.' The witness testified he saw decedent writing, but was at no time present when decedent was actually writing the will. After the will was written, Purcell accompanied decedent

to Dr. Bartlett's office to have his teeth extracted, after which they went to the State Building. Purcell then took Mr. Finkler to the Purcell home where he spent the night.

"This is the testimony, in substance, upon which appellants predicate the theory of undue influence.

"In the *Estate of Hamburger, supra,* the court says: 'It seems to us that the evidence shows that the contestant entertained but a suspicion of undue influence, unfounded in fact so far as shown by the testimony produced. "Proof, to establish undue influence, must be had of a pressure which overpowers the mind and bears down the volition of the testator at the time the will is made. It consists in the exercise of acts or conduct by which the mind of the testator is subjugated to the will of the person operating upon it (*Estate of Holloway,* 195 Cal. 711 [235 Pac. 1012]; *Estate of Anderson,* 185 Cal. 700 [198 Pac. 407]). Mere proof of opportunity to influence a testator's mind, even when coupled with an interest or motive to do so, will not sustain a finding of undue influence in the absence of testimony showing that there was a pressure operating directly on the testamentary act and to such an extent as to affect the terms of the testament. (*Estate of Fleming,* 199 Cal. 750 [251 Pac. 637]; *Estate of Bryson,* 191 Cal. 521 [217 Pac. 525].) It is not sufficient for a contestant merely to prove circumstances consistent with the exercise of undue influence, but, before a will can be overthrown, the circumstances proved must be inconsistent with voluntary action on the part of the testator. (*Estate of Morcel,* 162 Cal. 188 [121 Pac. 733].)" (*Estate of Donovan,* 114 Cal. App. 228 [299 Pac. 816].) See, also, *Estate of Presho,* 196 Cal. 639 [238 Pac. 944], and *Estate of McDevitt,* 95 Cal. 17 [30 Pac. 101].'

"The evidence in this case, when weighed by the standard just quoted, falls far short of showing any such undue influence as in effect destroyed the testator's free agency and overwhelmed his volition at the time of making the will. In fact, the evidence is entirely lacking as to the alleged undue influence of proponent M. J. Purcell."

The final contention of appellants is that the wrong document was admitted to probate in that decedent, after executing the will of April 21, 1930, made thereon certain cancellations, changes and interlineations, in his own handwriting, which altered the meaning of the instrument. Be-

hind this contention is the claim that under the document as altered, the deceased died intestate as to his real property, which is the bulk of the estate. In this behalf the court found that on April 21, 1930, the testator executed a holographic will in words and figures as follows, to wit:

"San Francisco, Cal April 21, 1930—All my property money or realty I will to Mike Purcell and B. Grant Taylor collectively—Any person legally proving relation they will give such person ten dollars—Both to act as executors without bonds—H. C. Finkler."

The court further found as follows: "That said Henry C. Finkler did subsequent to the execution of said will, and at a time subsequent to the 29th day of April, 1930, make certain alterations, interlineations, additions and changes in said will, but did not thereby revoke said will or any of the terms thereof, and that none of said alterations, interlineations, additions or changes were dated or signed by said testator, and were and are of no effect."

Allowing effect to the cancellations and interlineations, the document reads as follows: "San Francisco, Cal April 21, 1930—I will all my property, personal or mixed will to Mike Purcell and B. Grant Taylor collectively—Any person legally proving relationship to be given ten dollars—Codicils to follow—Both to act as executors without bonds. H. C. Finkler."

The court admitted to probate the document as originally executed, acting unquestionably upon the conviction that the cancellations and interlineations were of no effect, because not accompanied by a redating, reexecution and republication of the instrument. In this assumption the court fell into error. As the changes were made in the handwriting of the testator and the document as changed remained in his possession until his death, this raised the clear presumption that the changes were made *animo cancellandi*. The rule in this respect has been stated by Mr. Page in his work on Wills, volume 1, second edition, section 500, page 822, as follows:

"If witnesses are not necessary to the validity of a will, as under the ecclesiastical law, interlineations made by a testator after he has executed his will, are a part thereof; since, by his act of making such interlineations, intending them to be a part of his testament, testator has reexecuted

his testament in such form as would have been sufficient for the original execution thereof.

"Interlineations in a holographic will after execution are a part thereof; and if they are not in testator's handwriting, the will is rendered invalid thereby.

"Since holographic wills do not need witnesses, testator's act in erasing words and interlining others may amount to a revocation and reexecution, although such conduct would not have this effect if the will were an attested will.

"Here again, we have an apparent, but not a real exception to the general rule with reference to the effect of interlineations, since the holographic will needs no witnesses; and its execution in testator's handwriting, including the interlineations, is a sufficient compliance with the statute which regulates the original execution of the will; and hence it may be justified on the theory of a sufficient re-execution."

The doctrine is also supported by the following additional authorities, to wit: The case of *Succession of Guiraud,* 164 La. 620 [114 So. 489], where the testator, after making a bequest to his clerk in a paragraph of his will later interlined it with the following language: "I revoke the donation to Lionel Larrieu my clerk." The court said: "Even if the clause was inserted after the will was signed, and on a day actually subsequent to its date, it was the act of the testator himself, and the date and the signature apply to all that precede them, and make the instrument in its entirety a valid olographic testament." The applicable section of the Civil Code of Louisiana had the same meaning as our own former section 1292, subdivision 2cc, now section 74, subdivision 2 of the Probate Code. (*Estate of Fay,* 145 Cal. 82, 85 [78 Pac. 340, 104 Am. St. Rep. 17].)

The case of *LaRue* v. *Lee,* 63 W. Va. 388 [60 S. E. 388, 129 Am. St. Rep. 978, 14 L. R. A. (N. S.) 968], is instructive for, speaking of a will in somewhat the same condition as the one before us, the court said: "So we say that erasures in a holographic will, made by the hand of testator himself, is legal revocation of such portions as are so erased, since it is in the manner required for a will of that kind to be executed; and new portions written into such will by the same hand, to take the place of erasures, or new portions otherwise written therein by the same hand, being thereby executed in the manner which justifies the validity of a

holographic will originally, so long as the signature of the testator remains in such manner as to make it manifest that it is intended as a signature, do not in any sense invalidate the will or affect its finality, since it is then a complete new holographic will, and needs no reexecution or republication before witnesses, because it did not originally demand execution and publication before them. To say that the whole must be rewritten and again signed by the testator is simply to say that which is neither reasonable nor practicable.''

In fact this rule was necessarily indorsed and followed by this court in the case of *Estate of Wikman,* 148 Cal. 642 [84 Pac. 212], where the question before the court was the effect upon a holographic will of a deletion of the name of the executrix named therein. The court sustained this act as a revocation of that provision of the will and gave final effect to the instrument as changed. If such cancellations are to be sustained, then so must interlineations which have been made with testamentary intent.

But at this juncture we are met with a practical problem. If it be a fact that said documents when properly interpreted give the whole of decedent's estate to the same beneficiaries and in the same proportions, is the variance in verbiage so material that the judgment must be reversed and litigation prolonged until the will may be interpreted in some other court proceeding? Appellants, insisting upon this course, cite the rule that ordinarily questions of interpretation do not arise upon proceedings for the probate of a will. (*Estate of Murphy,* 104 Cal. 554 [38 Pac. 543]; *Estate of Cook,* 173 Cal. 465 [160 Pac. 553]; *Estate of Parsons,* 196 Cal. 294 [237 Pac. 744].)

Yet, in the first case cited by them, the court actually did interpret the two documents proposed for probate by holding that they were in all essential particulars harmonious, if not identical. The spirit of that decision seems applicable here for in effect we have two instruments before us, the one as executed on April 21, 1930, and remaining in that form until some unknown date subsequent to April 29, 1930, and the other instrument as later altered and amended. If they are both testamentary in character and dispose of the whole estate to the same parties in the same aliquot parts, what difference does it make whether the one, the other, or both are admitted to probate? (Sec. 72, Probate Code.)

Lest some injury might result to appellants, this court, of its own volition, called for supplemental briefs on the interpretation of these documents. Upon consideration of the able briefs filed, we are unable to reach any other result than that the meaning of the two instruments is identical. The words "all my property money or realty" and the words "all my property, personal or mixed", seem clearly to dispose of the estate of the testator in its entirety. If the first phase is all-inclusive, so must the second be. Doubt on this point is dispelled by the further provision found in the first edition, "Any person legally proving relation they will give such person ten dollars", and in the second edition, "Any person legally proving relationship to be given ten dollars." Both these sentences indicate a clear intent to omit all other persons than legatees named. The fact that both legatees are made executors without bonds has a further tendency to confirm the interpretation we here announce. The words of the second edition, "codicils to follow," do not throw any particular light upon the case as no codicils were found. Codicils may be used to restrict provisions already made, also to add new ones. Moreover, the presumption would be that on further reflection the testator decided against additional changes in his will.

We therefore conclude that while it was error to fail to probate the will in the languge thereof after the interlineations were made, still no possible injury can thereby result to appellants for, as above noted, the documents are identical in meaning and legal effect.

The judgment is affirmed.

Curtis, J., Seawell, J., Thompson, J., Shenk, J., and Spence, J., *pro tem.*, concurred.

Waste, C. J., being disqualified, did not participate herein.

LANGDON, J., Dissenting.—I dissent. The jury's verdict was that the testator was incompetent, and under the settled rule stated in the majority opinion, this verdict must be tested by examining the evidence in support thereof and disregarding contrary evidence. Upon such examination, the record fully supports the conclusion of incompetency.

That insanity was prevalent in the decedent's family appears from the majority opinion, and it is likewise conceded that he was old and eccentric in his behavior. These eccentricities, however, are considered not so great as to afford evidence of incompetency, in spite of the unnatural will, which ignores relatives and leaves property to strangers, and the peculiar circumstances of its execution, and its safeguarding in the hatband of the decedent. But the brief and inadequate summary of the evidence of the contestants, set forth in the opinion, does not present the real picture.

Many witnesses, in frequent contact with Finkler, testified that in their opinion he was mentally unsound. They further testified to conduct which can hardly permit of any other inference. He was a persistent collector of refuse and junk of no value. He had a habit of acquiring old-fashioned ladies' hats, which he would offer to his friends. He informed his friends that he was a great inventor, and among his achievements were a perpetual motion machine and a fuel for an internal combustion engine, made of human excreta. He disclosed to another that he had built an airship in the attic of his house, superior to any craft now flying, but that he refused to take the roof off the house and hence would permit the secret to die with him. He instructed visitors to save their urine, which he used for the purpose of sharpening saws. He suffered from fear of persecution and arrest, and possessed a number of loaded guns, which he carried and kept in his house. He claimed possession of supernatural power to wish evil to other persons. He also believed that there was a secret well on his premises which would supply his airplane with fuel, and was of the opinion that he had control over the water supply of San Mateo County, and could turn it off by means of a valve on his land. He described a cave connecting his home, near Redwood City, with the Golden Gate, through which people habitually passed.

On the day the will was executed, the decedent was suffering from toothache and neuralgia. He visited his dentist, who testified at length concerning Finkler's nervous, irrational condition at the time. In an attempt to extract the tooth, a local anesthetic was injected, and a quieting drug was administered. But the patient was recalcitrant and the dentist recommended a general anesthetic.

Finkler thereupon left the office and went directly to Purcell's store, where he executed the will immediately. The dentist testified that in his opinion the decedent was of unsound mind at the time he left the office.

The mere fact that decedent was an employee of this court up to the time of his death is not of particular significance in view of the testimony of respondent Taylor, clerk of the court, that in his opinion Finkler was, during the last few weeks of his life, of unsound mind. The conduct evidencing this mental unsoundness was, as stated above, not of late development, but was manifested over a period of several years, so that the jury might well conclude that the mental unsoundness which respondent Taylor observed at the period just before death was also present at the time the will was executed.

It seems to me that the jury might reasonably determine, as it did, from the recital of these circumstances, that the decedent was not possessed of the requisite testamentary capacity. I am not seriously concerned with the issue of undue influence, although Finkler's condition at the time the will was made was such that it would have required little persuasion to overcome his will, and an exceptional opportunity for Purcell to exercise such influence was presented.

I think that the recent unanimous decision of this court in *Estate of Bishop,* 2 Cal. (2d) 132 [39 Pac. (2d) 201], is wholly inconsistent with the present opinion, the evidence of incompetency in the record of that case being far less convincing than that presented in the instant case.

I am further unable to agree with the majority opinion because of its attempt to interpret the two instruments presented for probate. The holding that an holographic will may be changed by cancellation and interlineation in the hand of the testator, without new dating and signing, is sound and supported by authority; but the question whether these changes effected a different disposition of the estate is one of construction which cannot arise upon the probate of the will. It is not an issue before us, and should not be determined at this time. If the will is upheld, the meaning of the dispository clauses should be considered in the court below on petition for distribution. For this court to decide it now when it is not in issue, and thus preclude the proper determination of the matter when it is in issue, is a pro-

cedure for which there is no justification. The result of the majority opinion is to base the judgment upon an instrument which was not the one admitted to probate by the lower court.

I may add that the record is replete with instances of improper exclusion of relevant evidence offered by contestants, similar to that recited above.

The judgment should be reversed.

Rehearing denied.