[Civ. No. 22509. First Dist., Div. Two. Nov. 19, 1965.]

Estate of CECELIA PHIPPEN, Deceased. ELLIS R. WEIS-
KER, Petitioner and Appellant, v. H. WARNER PHIP-
PEN, Contestant and Respondent.

Guidotti & Mellana, Aldo P. Guidotti and John V. Trump for Petitioner and Appellant.

Kenneth I. Jones and Curtis G. Singleton for Contestant and Respondent.

SHOEMAKER, P. J.—This is an appeal from a judgment denying probate of 17 handwritten notebook and binder sheets which were offered as the last will and testament of Cecelia Phippen. The decedent's son, Ellis R. Weisker, is the appellant and proponent of the alleged holographic will, and her other son, H. Warner Phippen, is the respondent and contestant.

The decedent died on February 1, 1962, leaving as her sole heirs at law and next of kin her two adult half-brother sons. The 17 handwritten sheets of paper were found during an examination of the decedent's personal belongings which took place some time after her death.

The 17 sheets were not folded together, although they were in one group.

It was stipulated that the writing on the 17 sheets of paper was all in the hand of the decedent. Five of the sheets have lines and numbers imprinted on both sides and appear to have been torn from a notebook. The first such sheet is blank on the side which is numbered 39, and which would have been a right-hand page before it was torn from the notebook. The reverse side of this sheet is numbered 40 and, while still in the notebook, would have faced the page numbered 41. Across the top of pages 40 and 41 appears the heading "Rough Division [as] I see it now." Page 40 bears the subheading "Ellis Share," beneath which appears a list of monetary assets totaling $16,483.29 and specific items of personal property. Page 41 bears the subheading "Warner Share," and similarly contains a list of monetary assets totaling $16,483.29 and various items of personal property. Page 42 is headed

"Lurene" and page 43, "Carol."[1] Both pages contain lists of specific items of personal property. Page 44 is headed "Helen" and contains instructions as to the distribution of various other items of personal property. These instructions are continued on pages 45 and 46. Page 46 concludes with the following: "Trusting by doing what I have tonight will avoid any arguments or hard feelings I am with *love to all* and wishing for the happiness of all Your Loving Mother C. E. Phippen." Page 47 lists other items of personal property and indicates that certain of these items are to go to specified individuals. At the bottom of this page appear the words, "Certainly surprized [sic] there is so many things." Page 48 is blank. The handwriting on pages 40 through 47 is all in pencil. The only date appearing on any of these pages is "12-25-1912" which apparently gives the date on which the decedent acquired an initialed watch listed on page 43.

The remaining 12 sheets are lined and of approximately the same size as the notebook pages, but are cleaner and newer in appearance. Each sheet has three holes in the left-hand margin and was apparently fastened in a binder at one time. The sheets are without printed numbers. The writing on the 12 sheets is in ink, with the exception of certain penciled additions on three of the sheets.

On six of the twelve sheets of binder paper, the decedent has again listed various assets and items of personal property beneath the names of the individuals in her immediate family. At the top of one of the sheets appears the date "Aug. 15th 1954," "Inventory of My Belongings," the names "Ellis and Helen," and the circled number "1." Specified assets and items of personal property are listed below and assigned monetary values. Additional items of personal property are listed on a second sheet below the names "Ellis and Helen" and the circled number "2." Many of the items appearing on these two sheets were listed as part of Ellis' share on page 40 of the penciled notepaper. Thus, a $3,000 note which Ellis owed the decedent, a chiffonier, a dressing table, a bureau, a large oak rocking chair, the "second largest suitcase," and the "silver with 'W' on it" appear on both lists. Other items, which appear for the first time on the sheets of binder paper, are preceded by dates which indicate that they were acquired in 1952 and 1953. Bonds which were valued at $2,043.75 on the earlier notepaper list are valued at $1,650 on the binder

---

[1]Lurene and Carol are the decedent's granddaughters and the children of Ellis and Helen Weisker.

paper list. A $1,000 note which Ellis owed the decedent appears for the first time on the binder paper list.

At the top of a third sheet of binder paper appears the date "Aug 15th 1954," "Inventory of My Belongings," the name "Warner" and the circled number "1." A fourth sheet is headed "Warner," and bears the circled number "2." Both sheets contain lists of assets and personal property as to which, in some instances, the monetary value is also given. As in the case of Ellis, many of the items listed below Warner's name also appeared on page 41 of the notebook paper as part of his share. Thus, both lists include a trunk, a deep freezer and contents, a washing machine, a sewing machine, the "largest suitcase," and a large diamond ring. The bonds listed beneath Warner's name have also been reduced in value from $2,043.75 to $1,650. However, a one-half interest in an auto court has been increased in value from $12,000 to $14,000. Several items of personal property (earrings, candy jars and a prism) appear for the first time on the binder paper list.

A fifth sheet of binder paper bears the heading "Lurene— Aug 15th 1954" and the sixth sheet is headed "Carol—Aug 15th 1954." Both sheets contain lists of personal property which are substantially identical with those on pages 42 and 43 of the notebook sheets. However, a few new items do appear on the binder paper lists. Lurene's list mentions a four-piece red canister set which was previously listed as part of Ellis' share on page 40 of the notebook paper. Lurene's list for the first time includes a new electric iron and Carol's includes an older electric iron and a typewriter. Page 45 of the notebook paper contained instructions that the typewriter go jointly to Ellis, Helen, Lurene and Carol.

The remaining six sheets of binder paper have no obvious connection, either by date or content, with the six sheets written on August 15, 1954. Two of the sheets, which are labeled "Reference Only," list by number, amount, and date of acquisition, certain 10-year bonds which were jointly owned by the decedent and each of her two sons. One of these sheets lists five bonds of a total value of $1,650, which were payable in 1954 either to the decedent or Ellis Weisker. The second sheet lists five bonds of the same total value and maturity dates which were payable either to the decedent or Warner Phippen. Neither sheet is dated.

. A third undated sheet is headed "The following will have to be Probated" and lists certain bank accounts and real property interests. Certain of the items are crossed out in

pencil and the words "vary small" and "sold" have been penciled in.

A fourth undated sheet headed "My Assets" again lists bank accounts, bonds, the $3,000 note owed by Ellis and various real property in interests. Certain items have been crossed out in pencil and certain figures penciled in.

A fifth sheet is headed "Assets of Cecelia E. Phippen." Beneath this heading is written "To whom it may concern. C.E.P. September 30th 1955." There follows a list of bank accounts, bonds, two notes owed by Ellis, and several real property interests. Here again, certain items have been crossed out in pencil and certain figures penciled it.

The sixth sheet is undated and labeled "Bedding." Below appears a list of same, certain real property interests and two items of personal property. Certain bank accounts are listed on the back of the sheet.

The trial court found the notebook pages numbered from 40 to 47 were written by the decedent prior to August 15, 1954, but were undated; that at subsequent times, the decedent wrote notes and made inventories of her property on other sheets of paper which were of the same size; that all of these sheets were found together in a miscellaneous collection of papers in a corner of a room in the decedent's home; that none of the sheets were folded, wrapped or fastened together in any manner; that the notebook pages numbered from 40 to 47 were testamentary in character and would have been sufficient as a holographic will had they been dated; that the additional sheets of paper contained the dates August 15, 1954, and September 30, 1955, but were not written with testamentary intent and were not sufficiently connected with the undated notebook pages to constitute a valid codicil, to republish the notebook pages, to incorporate them by reference or to integrate them; that the decedent died intestate and that her sole heirs at law and next of kin were her two sons, Ellis Weisker and Warner Phippen. Judgment was entered denying probate of the 17 handwritten sheets.

Proponent Weisker concedes, at the outset, that the trial court was correct in finding that none of the handwritten binder pages either incorporated by reference or republished the earlier undated notebook pages. Proponent's sole contention is that the doctrine of integration applies because the notebook pages and the dated binder pages are connected by sequence of thought. Proponent relies upon the court's

finding that the notebook pages were testamentary in nature and were insufficient as a holographic will only in that they were undated. He seeks to supply such date by integrating them either with the binder pages dated August 15, 1954, or with the binder page dated September 30, 1955.

Contestant Phippen, on the other hand, denies that any of the 17 pages were written with testamentary intent. He seeks to controvert the court's finding that the notebook pages were written with such intent and asserts at one point in his brief that the decedent did not intend to make a division and distribution of her property, and, at another, that the decedent intended to effect an *inter vivos* transfer of her property. Contestant also denies that the notebook pages were integrated with the dated binder pages.

 In the instant case, the record contains no evidence as to the decedent's testamentary intentions. Under such circumstances, the validity of the holographic documents must be determined by this court entirely by reference to the applicable statutes and principles of law. (*Estate of McCarty* (1962) 211 Cal.App.2d 23, 26 [27 Cal.Rptr. 94]; *Estate of Wunderle* (1947) 30 Cal.2d 274, 280 [181 P.2d 874].)

 Contestant's contention that the notebook pages were not testamentary in nature is meritless. By these pages, the decedent undertook to list beneath the names of her intended beneficiaries virtually every item of personal property which she possessed. Her statement that she hoped to avoid arguments and hard feelings "by doing what I have tonight" is clearly indicative of her belief that by the preceding pages she had effected a testamentary disposition of the property listed. It is equally apparent that she did not intend to effect an immediate *inter vivos* transfer. The decedent obviously intended that many of the items listed, such as household furnishings and appliances, would continue to be used by her until her death. On page 41, the decedent instructed her son Warner to divide the groceries between himself and Ellis. She obviously could not have intended any such division to be effected prior to her death. The heading "Rough Division [as] I see it now" is also consistent with an intent to make a revocable disposition of her property to take effect only upon her death.

The question remaining is whether proponent is correct in asserting that the notebook pages, although undated, may be validated by the doctrine of integration.

Probate Code, section 53, provides in pertinent part as follows: "A holographic will is one that is entirely written, dated and signed by the hand of the testator himself. It is subject to no other form, and need not be witnessed."

■ Under the doctrine of integration, two or more handwritten documents which do not refer to one another may be admitted to probate when it is clear that the testator intended them to be his will. (*Estate of McCarty, supra,* at p. 27; *Estate of Wunderle, supra,* at p. 281.) ■ Such intent is evidenced where the several writings are connected by sequence of thought (*Estate of Swendsen* (1941) 43 Cal.App.2d 551 [111 P.2d 408]), folded together (*Estate of Merryfield* (1914) 167 Cal. 729 [141 P. 259]), or physically forming one document (*Estate of Clisby* (1904) 145 Cal. 407 [78 P. 964, 104 Am.St.Rep. 58]). ■ A holographic will need not be signed at the end (*Estate of Morgan* (1927) 200 Cal. 400 [253 P. 702]), and the testator may alter a holographic will subsequent to the date on which he signed it. (*Estate of Finkler* (1935) 3 Cal.2d 584, 599-602 [46 P.2d 149].) Such alterations, when made in the testator's handwriting, operate to adopt the old date and signature. (See *Estate of Dumas* (1949) 34 Cal.2d 406, 410-411 [210 P.2d 697], and authorities therein cited.) ■ "If the papers are all holographic and there is a dating and signing somewhere among them, it is immaterial when or where the dating or signing was done so long as it may be reasonably inferred that the testator meant all the papers together to constitute his will and that the signature was written with the intent that it should there serve as a token of execution." (*Estate of Moody* (1953) 118 Cal.App.2d 300, 308 [257 P.2d 709].)

■ In the instant case, the trial court found that the notebook pages were written prior to the binder pages. This finding is entirely reasonable, since the notebook pages are older in appearance and conclude with the decedent's statement that she was surprised that there were so many things. This remark clearly suggests that she was making her initial attempt to itemize her possessions.

■ The court's finding that the 17 sheets of notebook and binder paper were not folded, wrapped or fastened together in any manner is supported by contestant's testimony and accordingly must be upheld.

■ The court's finding that the binder pages were not sufficiently connected with the earlier notebook pages to integrate them is based solely upon its examination of the docu-

ments themselves. This finding is clearly correct as to the six sheets (including the sheet dated September 30, 1955) which merely list the decedent's various assets. None of these sheets dispose of any assets to specified individuals and two of the sheets are expressly labeled ''Reference Only.'' In our opinion, they were not intended to have any legal effect and were for the stated purpose of acquainting the decedent's two sons with her various assets.

A different situation is presented, however, as to the six sheets which were written on August 15, 1954. These sheets are strikingly similar, both in form and content, to the earlier notebook pages which the court found to be testamentary in nature. Here again, the decedent has undertaken a detailed itemization of her property below the names of her intended beneficiaries. The fact that virtually all of the items listed on the earlier notebook pages have been carried over onto the binder pages strongly suggests that the decedent had the earlier pages before her when the binder pages were written. The binder pages were obviously written for the purpose of reaffirming her prior testamentary scheme and updating it by disposing of items subsequently acquired. She also sought to indicate that certain of her assets had changed in value and, in at least one instance, indicated that a particular asset (the red canister set) should go to a different beneficiary.

In view of the manifest continuity of content between the notebook and binder sheets, we do not doubt that the decedent intended these sheets to be considered together as one continuous and complete document. Since the notebook sheets contain the decedent's signature and the binder sheets contain a date, they were clearly sufficient, when taken together, to fulfill the requirements of Probate Code, section 53.

The judgment is reversed.

Agee, J., and Taylor, J., concurred.