[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 226 
This is an appeal from a decree of the superior court of the city and county of San Francisco dismissing a petition for the revocation of the probate of a codicil to the last will of deceased and from an order denying a motion for a new trial.
Adolph C. Weber made his will August 29, 1905, and the codicil attacked was made April 5, 1906. He died at San Francisco, in the German hospital, on April 27, 1906. Both the will and the codicil were admitted to probate June 19, 1906. Deceased left surviving him a son, Adolph, and a married daughter, Mrs. Spranger, the latter being the contestant and appellant. At the time of her father's death she was in Europe; she returned to San Francisco on June 19, 1906, the day on which the will and codicil were admitted to probate, of which, however, she does not appear then to have *Page 227 
had knowledge. On June 18, 1907, she filed her contest of the codicil on these grounds: 1. That at the time of its execution her father was not of sound and disposing mind; 2. Because of the undue influence of the testator's son, Adolph, and one Maximilian Bender in procuring the codicil to be executed; 3. That the codicil was not executed, attested or published as required by law.
Among the provisions of the will was the following: "I have heretofore made gifts and advances to my children Adolph H. Weber and Augusta Spranger. It is my intention that neither of my said children be charged with any gifts or advances that heretofore have been made to them or that shall hereafter before my death be made to them, or to either of them." No question arises as to the mental and physical capacity of the testator to make the will at the time of its execution and it is not now attacked.
The codicil is as follows: "I hereby add the following to my last will and testament: I hereby declare that the following gifts and grants made by me to my children, hereinafter named, were made as and are hereby charged to be advancements by me to them of a part of their respective shares." A certain gift of money by him to his son is then specifically mentioned and also certain real property conveyed to the son. Next is specified certain pieces of real estate conveyed by him to his daughter. The codicil concludes as follows:
"Inasmuch as the said advancements made by me to my said daughter greatly exceed in value said advancements made by me to my said son, I hereby give and bequeath to my said son, Adolph H. Weber, the equivalent in value in cash or negotiable securities or both, as he may select, of the excess in value of the said advancements made by me to my said daughter over the said advancements made by me to my said son.
"(Signed) ADOLPH C. WEBER."
The certificate signed by the witnesses conforms to the requirements of the code, and is signed by Erasmus Ad. Dahlstrom and Mrs. Elizabeth Steiner, both residing at 1422 Sutter street, the home of deceased. They were servants in his household.
The will was prepared by Mr. Alexander D. Keyes from instructions given him directly by Mr. Weber. Mr. Keyes *Page 228 
was attorney for the Humboldt Savings Bank, of which Mr. Weber had been the president for many years and of which Mr. Keyes had at times served as codirector. One of the witnesses to the will, Dahlstrom, was a witness to the codicil.
The codicil was prepared by Mr. Francis H. Dam, one of the attorneys for respondent, from instructions received from Mr. Weber's son, and when prepared was sent to Max F. Bender, named in the will as one of the executors, who attended to its execution. The son, so far as appears, took no part in securing its execution, and did not appear as a witness at the hearing of the contest of the codicil.
The court made findings in favor of respondents, and, as they meet the specific averments of the petition to revoke the codicil, they will serve the double purpose of showing what was alleged in the petition as grounds for the contest, and the findings of the court and conclusions thereon, dismissing the petition. These findings are as follows:
 "III.
"That said codicil was executed by said Adolph C. Weber, deceased, on the 5th day of April, 1906, and bears the date of April 5th, 1906; that at the time of the making and signing of said codicil the said Adolph C. Weber, deceased, was of sound and disposing mind; that on the date last aforesaid said deceased was not of unsound mind or mentally incompetent or unable to make or then execute the said codicil, or make or execute any codicil whatever.
 "IV.
"That said Adolph C. Weber, deceased, left a will executed and dated August 29th, 1905, and that said will was admitted to probate by an order of this court, duly given and made, on the 19th day of June, 1906; that said codicil was admitted to probate by an order of this court duly given and made on the 19th day of June, 1906; that at the time said will was made said Adolph C. Weber was of the age of seventy-nine years; that at the time the said will was made the said Adolph C. Weber was not then suffering or did not continue to suffer thereafter until the date of his death, or did not suffer thereafter at any time prior to the making of said codicil, from disease or diseases which produced in him great physical or any mental weakness; that at the time said will was made said Adolph C. Weber was not physically or mentally weak *Page 229 
or feeble; that physical or mental weakness on the part of Adolph C. Weber did not steadily or rapidly increase from the making of said will until the time of his death; that Adolph H. Weber did not learn of the contents of said will shortly after the execution thereof or long or at any time prior to the making of said codicil; that Adolph H. Weber did not conspire or collude with Maximilian Bender to induce said Adolph C. Weber to change said will by the execution of said codicil; that it was not the will or intention of said Adolph C. Weber continuously from the date of the execution of the said will to the date of his death or at the time of making the said codicil, or thereafter, to dispose of his property as provided in said will; that said codicil did and does express the wishes and will of said testator and did not or does not express the wishes or will of said Adolph H. Weber; that the said Adolph H. Weber did not with the assistance of said Maximilian Bender, or otherwise, or at all, overcome the wishes of said testator, or constrain him to do that which he would not otherwise have done, by the exercise of undue or any influence on the part of Maximilian Bender, or by the exercise of duress on the part of Adolph H. Weber, or otherwise, or at all; that said Bender was an intimate acquaintance of the said Adolph C. Weber for many years prior to his death; that said Bender did not pretend to be a friend of said testator or to advise him in his affairs impartially or disinterestedly, because of any pretended friendship, but said Bender was in fact a friend of said testator, and did advise him in his affairs impartially and disinterestedly; that said Bender did not designedly, or otherwise, or at all, seek to influence said testator by conspiring or colluding with the said Adolph H. Weber in order to procure for said Weber a larger or any interest in said testator's estate, or at all; that said Bender did not, as a pretended friend of said testator, wait upon him or perform various or any services for a year or more, or at any time prior to the death of said testator; that said testator was not at any time after the execution of said will of August 29th, 1905, or up to the time of his death, by reason of any infirmities, or otherwise, or at all, easily or at all influenced or susceptible to the influence or will of said Bender, or unable to oppose his wishes or will to the wishes or will of said Bender; that Adolph H. Weber did not *Page 230 
notify the said Bender of the terms or conditions of said will shortly after August 29th, 1905, or for weeks; or at any time prior to the date of said codicil; that at the time of the making of said codicil, the said Bender did not know and was not aware of the terms or conditions of said will, except that the said Bender had been appointed an executor thereof; that said Bender did not continuously, or at any time after the making of said will, actively, or at all, urge upon said testator that he modify said will by the execution of said codicil, or otherwise, or at all; that the said Adolph H. Weber did not at any time before the making of said codicil in an angry or threatening manner, or otherwise, or at all, demand or insist of said testator that he execute said codicil or threaten to apply for letters of guardianship on the ground of the alleged incompetency of said testator, unless he execute said codicil, or at all; that the said testator was not induced, contrary to his wishes or intention, to execute said codicil as a result of any duress or menacing conduct by said Adolph H. Weber, or any undue or any influence of said Bender, or otherwise; that said codicil was and is executed, attested and published as required by law; that the signature of said testator was acknowledged by him to the attesting witnesses to said codicil, and each of them, to be made by said testator; that the attesting witnesses to said codicil did sign their respective names at the end of said codicil at the request of said testator; that the said codicil was published and acknowledged by said testator as his codicil and that the said codicil is a codicil of said testator."
The record is somewhat voluminous and upon vital facts the evidence is conflicting. We shall not undertake to analyze all the testimony or enter upon any extended discussion of its legal effect, for we are satisfied that, under rules of procedure by which we are governed, there is but one conclusion open to us — namely, that there is evidence sufficient to support the findings.
1. The first question presented by appellant concerns the mental capacity of deceased when he executed the codicil. Appellant attempts to sustain her contention by casting doubt upon the soundness of mind of deceased when he executed the will. We attach no importance to that question, for the witness, Keyes, upon whose testimony appellant relies, said *Page 231 
that while he had "some slight hesitation on the subject," he testified: "My conclusion was that he was a man of sound mind." He added: "But very much weakened." Suffice it to say that the findings of the court on the probate of the will are not called in question, and the soundness of the testator's mind when the will was executed cannot now be disputed.
At a later stage of his testimony Mr. Keyes gave strong emphasis to the fact that Mr. Weber was a very self-willed, strong-minded man. "He was a man who believed in what he called military discipline, in obedience and submission to authority, and he was a leader; a man of positive views. He would not tolerate interference with his plans. . . . He was a fair-minded man." He was asked if he noticed anything in his demeanor after the will was executed and replied: "I noticed he was growing weaker steadily; I think mentally, and particularly physically. Q. What signs of mental weakness, if any, did you observe in him? A. Inability to grasp ideas quickly and loss of memory." On cross-examination by counsel for respondent, he said he had signed the petition for the probate of the will and codicil.
Witness Max F. Bender was made an executor of the will; his relations with the testator were quite intimate and friendly, and in many respects may be said to have been confidential. During the last year or two of his life Mr. Weber had retired from active business and was confined to his house by illness, not of such nature, however, as would necessarily at once impair his mental faculties. Bender was a frequent visitor at the home of deceased. He testified that he read the letters aloud to Mr. Weber which came to him from his daughter then in Europe "and discussed the same with him"; that Mr. Weber delivered stocks and bonds into Bender's possession to hold in trust for deceased; that he "frequently wrote letters for Mr. Weber." In many other ways it was shown that Mr. Bender was in a position to know Mr. Weber's mental condition and whether he was of sound and disposing mind, as his visits at his home continued up to April 17, 1906. He testified: "I have known Adolph C. Weber since the year 1874. My relations with Mr. Weber were always friendly. During the first year of my acquaintance with him I saw him a great deal, as he was a next door neighbor of a family named *Page 232 
Schmidt. I married a daughter of Mr. Schmidt. During the last two years of his lifetime I saw Mr. Weber from two to three times a week. I conversed with him quite frequently. I knew the members of Mr. Weber's family in San Francisco and he knew the members of mine. I have an opinion as to the soundness or unsoundness of mind of Adolph C. Weber on the fifth day of April, 1906. It is my opinion that on that day he was of perfectly sound mind."
Erasmus Ad. Dahlstrom was the witness to the codicil on whose testimony it was admitted to probate. In his affidavit he stated: "The said instrument was signed and sealed by the said Adolph C. Weber, at his residence in the city and county of San Francisco, on the said fifth day of April, A.D. 1906, the day it bears date, in the presence of myself and of said Elizabeth Steiner, and the said Adolph C. Weber thereupon published the said instrument as, and declared to us the same to be, a codicil to his last will and testament, and requested us in attestation thereof to sign the same as witnesses. The said Elizabeth Steiner and I then and there, in the presence of the said Adolph C. Weber and in the presence of each other, subscribed our names as witnesses to the said instrument. At the time of executing the said instrument, to wit, the fifth day of April, 1906, the said Adolph C. Weber was over the age of eighteen years, to wit, of the age of eighty years or thereabouts, and was of sound and disposing mind, and not acting under duress, menace, fraud or undue influence."
Attorney Jubal Early Craig conducted the proceedings for the executors at the probate of the codicil. He testified: "I asked Mr. Dahlstrom his name and residence. He replied that his name was Erasmus Ad. Dahlstrom. I asked Mr. Dahlstrom if he was acquainted with the testator in his lifetime. He said he was. By the testator I mean Adolph C. Weber. I asked him if he was present at the execution of the document purporting to be a codicil to the last will and testament of Adolph C. Weber. He said that he was. I asked him if he knew the other witness whose name was subscribed to that document as a subscribing witness, Mrs. Elizabeth Steiner. He answered yes. I asked him if the instrument purporting to be the codicil of the last will of Adolph C. Weber was executed by was signed by Adolph C. Weber and declared *Page 233 
by him to the two witnesses to be his codicil to the last will and testament. He answered 'Yes.' I asked him if Adolph C. Weber requested him and the other witness, Elizabeth Steiner, to sign this document as subscribing witnesses, and he answered 'Yes.' I asked him if he then signed it in the presence of the testator as a subscribing witness and in the presence of the other subscribing witness, and he answered 'Yes.' I asked him if the other subscribing witness signed in the presence of the testator and in his presence, and he answered 'Yes.' I asked him if the testator, Adolph C. Weber, was of sound mind at the time, and he answered 'Yes.' Those are substantially the questions and answers. Q. Did you ask him as to whether he was of disposing memory? A. I asked him in the words that are here; sound mind, sound and disposing mind, and whether he was acting under duress, menace, fraud and undue influence. He said Mr. Weber was of sound mind and that he was not acting under menace, duress, fraud or undue influence. I framed two questions. The first as to sound and disposing mind. He answered 'Yes.' To the second he answered 'No.' After I completed my examination of the witness, Judge Coffey asked Mr. Dahlstrom some questions with reference to the execution of the codicil and also with reference to the execution of the will. Whether Judge Coffey covered the same ground as I did I do not know. I know he covered part of the same ground."
Dahlstrom was called as a witness for contestant upon the point relating to the publication of the codicil, presently to be noticed; he was also asked some questions as to whether any change had taken place in Mr. Weber's health since the will was executed, and answered that he was "gradually weaker day by day"; that he read the morning paper and the witness generally read to him the "Post" in the evening — "up to the time of the earthquake" (of April 18, 1906); after that he was "upset too much to read." He also testified that "his memory was getting weaker." Witness "waited on him personally"; helped him up and down stairs. It appeared that Mr. Weber suffered from rheumatism and diabetes; that he kept close watch on what was transpiring in the house; that he enjoyed hearing witness read the newspapers; was interested in what was going on in the world; witness had known him for sixteen years; that he was a strong-minded, self-willed *Page 234 
man, ran things in his house his own way; "he was an exceptionally determined and strong-minded man"; that he did not want to be removed from the house, which occurred while the city was burning. This is substantially his testimony on the question of testator's soundness of mind.
Mrs. Steiner, the other witness to the codicil, was not called at the probate, but was a witness at the contest of the codicil. She testified to nothing bearing upon the testator's soundness of mind further than to speak incidentally of his growing weaker toward the close of his life.
Mr. Charles E. Hatch, an attorney at law, was called by contestant, and testified that he had known Mr. Weber for many years and knew him in the month of February, 1906, and was in the habit of visiting him socially; that in his opinion Mr. Weber was not competent to make a will at that time; that his "opinion was based upon his physical condition and the remarks he would make showing that he did not have that capacity — he was not the Weber of old. . . . We did not talk about business in our conversation. I could see from his conversation that he was not capable of transacting business, because certain things he was interested in socially he would seem to forget all about."
Frederick Koch testified for contestant, that he had known Mr. Weber many years; had attended to real estate business for the Humboldt Savings Bank; that he visited Mr. Weber in January, February and March, 1906. When asked his opinion as to Mr. Weber's mental condition, he answered: "I don't think he was of sound mind like he used to be." His reasons for this opinion were called for, and he answered: "Well, sometimes we talked about certain matters and he stopped all at once and started something else; then it was something else, and finally he got back to the question about the same talk that we were talking on before."
We have given in substance all the testimony upon the point now being considered. It seems quite clear that there was a progressive decline in Mr. Weber's physical condition, and that there was gradual impairment of his mental faculties, but it does not appear from the reasons given by witnesses, as to the extent of this impairment, that when he executed the codicil he did not have such strength of mind as to fully understand what he was doing. The testimony of Mr. *Page 235 
Keyes and of the servants in the house, Dahlstrom and Steiner, is very guarded and inconclusive. Soundness of mind is to be presumed, and to show the contrary by satisfactory evidence was a burden cast upon contestant which we do not think was sustained. Besides, there was evidence tending to show testamentary capacity, and sufficient to produce a conflict upon the issue, which we must leave where the trial court left it. The proposition involved in the codicil was not complicated, but simple, and consisted merely in directing that the gifts already made to his children, being of unequal value, should be equalized in the final division of the property.
There is no necessary and compelling force in established physical infirmity which carries with it the inference of mental incapacity. A person may be very feeble, may be aged and infirm and suffering from disease, and yet be capable of disposing of his property. (Estate of Motz, 136 Cal. 562, [69 P. 294]; Estate of Morey, 147 Cal. 503, [82 P. 57].) The mind may triumph over wasting disease, may rise superior to the decrepitude of old age. These are but evidences which may or may not exist, but they are not incompatible with entire soundness of mind or of testamentary capacity.
2. It is next contended that the codicil did not express the wishes of the testator, but the wishes of his son, and that it was secured by the undue influence of the son and Max Bender, who, it is alleged, conspired to procure a larger interest in the estate for the son than was provided in the will. The support put forward to sustain this contention is largely, if not wholly, circumstantial. The chief of the circumstances relied upon are, that the directions by the testator for the preparation of the codicil were given to Mr. Bender; that he communicated the desire of Mr. Weber to his son; that his son went to Mr. Dam, instead of Mr. Keyes, who had drawn the will; that Mr. Dam made no inquiry as to Mr. Weber's mental condition; did not see the will or know its contents, but followed the son's direction, prepared the codicil and mailed it to Mr. Bender; that later Bender telephoned him that the codicil was mislaid and requested him to send a copy, which he did; that the codicil was subsequently executed with the guidance of Mr. Bender and under circumstances confirmatory of the alleged conspiracy between him and Mr. Weber's son, and that in the transaction Mr. Weber had no independent advice. *Page 236 
It appeared that the testator had made several wills previously to the one here; that the thought was in his mind that he might want to add a codicil; he talked with Mr. Keyes about it, and Mr. Keyes gave him instructions showing how simple a thing it was; that in fact the will, by leaving the advancements to the two children unchanged, gave the daughter a greater share of the property of their father than the son was to receive; that Mr. Weber talked these matters over with Mr. Bender, and finally gave him instructions to have the codicil prepared; that it was prepared as shown above and read to Mr. Weber and examined and kept by him; that some time later he brought the subject up again with Mr. Bender, and on inquiry the paper could not be found; that Mr. Bender sent to Mr. Dam for a copy, which was received and shown Mr. Weber, who expressed satisfaction with it and declared his intention to then sign it; that the house servants, Dahlstrom and Steiner, were called to witness the codicil. Mr. Bender knew that a will had been made and also who were named as executors, but knew nothing of its provisions except as might be inferred from what Mr. Weber told him concerning the proposed codicil — that he wanted to equalize the estate so that each of his children should get his or her proper share, giving specific directions in respect of the advancements mentioned in the will. There is no evidence that the son knew what was provided in the will further than these directions as to the codicil disclosed. He was not called as a witness in the contest. Much stress is laid on the fact that Mr. Dam, instead of Mr. Keyes, was employed to prepare the codicil, and upon the fact that the son was not called as a witness by the respondent to explain his part in causing the codicil to be executed, and also on the fact that Mr. Dam drew the document without seeing the will or talking with the one who executed it. We see no evidence of a conspiracy because Mr. Keyes was not chosen to prepare the codicil; Mr. Dam was a reputable attorney, the service was not an unusual one or in the least complicated or requiring directions first hand, and he testified that nothing transpired in the hour he spent with Mr. Weber's son to arouse any suspicion that any unfairness or advantage over anyone was being taken; that he assumed that Mr. Weber knew what he wanted, and had given directions to Mr. Bender as reported to him by the son. Nor can we say, as is urged, *Page 237 
that the trial court erred in not further probing into the matter, and especially in not requiring the son to make explanation. The contestant made no such showing as demanded explanation on his part; he had nothing to do with procuring his father's signature to the codicil either before or at the time it was placed there. If the court was satisfied, as it must have been, with Mr. Bender's account of all the circumstances attending it, we see no reason why we should not be. The facts must go further than to raise a suspicion of undue influence. As was said in Estate of McDevitt, 95 Cal. 17
(33, 34), [30 P. 101, 106]: "Evidence must be produced that pressure was brought to bear directly upon the testamentary act; but this evidence need not be direct. Circumstantial evidence is sufficient. It must, however, do more than raise a suspicion." Mere opportunity to exercise undue influence is not sufficient. (Estate of Black, 132 Cal. 395, [64 P. 695].) "The kind of undue influence that will destroy the instrument must be such as in effect destroyed the testator's free agency, and substituted for his own another person's will." (Estate ofMotz, 136 Cal. 563, [69 P. 295].)
We think the court was fully warranted in finding that there was neither conspiracy on the part of the son and Mr. Bender, nor undue influence exercised by them, or either of them, to cause the execution of the codicil.
3. Was the codicil duly executed and published? At its probate one of the witnesses, Dahlstrom, testified, as we have seen, that the testator subscribed the instrument, declared it to be a codicil to his will, and requested the attesting witnesses to sign the same as witnesses. It is true that at this present hearing Dahlstrom's memory did not enable him to confirm his former testimony — in short, he retracted the statements made at the probate and testified that Mr. Weber did not ask him to sign the paper, did not say what it was, nor did Mr. Bender. The other witness testified that nothing was said by the testator; that she was requested by Mr. Bender to come to Mr. Weber's room and sign a paper; that Mr. Weber said nothing and Mr. Bender said nothing, "only to sign"; that she knew nothing at all about what she was signing. Mr. Bender testified that he called these two persons at Mr. Weber's request to witness the codicil. He testified: "When they came in Mr. Weber said, 'I am going to sign this codicil *Page 238 
in your presence, the codicil to my will, and I want you to act as witnesses.' He said that to Mr. Dahlstrom and Mrs. Steiner. Both Mr. Dahlstrom and Mrs. Steiner were within his hearing at the time, at most perhaps not more than three or four feet away. . . . After having spoken, Mr. Weber got off the side of his bed — he was sitting on his bed — took the chair, and after I had put in the date, the 5th of April, into the document, he took the pen and signed his name." He testified that at the request of Mr. Weber, Dahlstrom then signed and afterward Mrs. Steiner did the same. They then left the room.
There was some evidence showing disappointment on the part of these two persons upon learning that no provision was made for them and that they had shown some interest in Mrs. Spranger's success in her contest. But apart from this, it seems to us that there is nothing in the evidence, or in any or all of the circumstances connected with the preparation and final execution of the codicil, which would justify us in holding that the trial court erred in accepting Mr. Bender's testimony and rejecting that of the two subscribing witnesses.
4. One error only is assigned as occurring in the course of the trial. Mrs. Steiner was called by the contestant on redirect examination. She testified that young Weber called more frequently than when the witness was first employed. "Q. Did you ever hear any loud talking going on in the room between them? Mr. Dam: I object as immaterial, irrelevant and incompetent, and not redirect examination. The Court: Sustained. . . . Mr. Wright: We ask your honor to allow us an exception." It was not suggested that this loud talking had any relation to any issue in the case, or that it was to be followed up in any way or explained. The ruling was not error.
The judgment and order are affirmed.
Hart, J., and Burnett, J., concurred. *Page 239