[Civ. No. 14040.  First Dist., Div. Two.  July 15, 1949.]

Estate of FILIPPO CECALA, Deceased.  ROSARIO CE-
CALA et al., Appellants, v. SARAH NASO et al., Re-
spondents.

O. H. Speciale for Appellants.

Rankin, O'Neal, Luckhardt, Center & Hall, M. S. Hall, Foley & Foley and James W. Foley for Respondents.

GOODELL, J.—A document purporting to be the last will and testament of Filippo Cecala, dated February 9, 1935, was admitted to probate after a contest tried by jury. A new trial was denied. From the order entered on the verdict this appeal was taken. The contestants and appellants are the son and daughter of the testator; the proponent and respondent his other daughter.

The testator died on February 12, 1935 at about 5 a.m. leaving a widow, Rosaria Cecala (who died in 1946) and said son and two daughters.

Appellants' contention was and is that after decedent expired respondent forged the will by typewriting it in the home about 6:30 a.m. and making the ''X'' thereon which purports to be her father's mark, and then prevailed on R. Anzalone (her sister's husband), P. Morroni and Rosi Morroni, and Rosaria Cecala (testator's widow) to sign as witnesses, by representing to them that the document had to do with funeral arrangements; that they signed it separately before the body had been taken to the undertaker's.

R. Anzalone testified that he signed in the kitchen at Sarah Naso's instance and with nobody but her present, about an hour and a half after the death, on her representation that the document had to do with the funeral.

P. Morroni testified to the same effect.

Rosi Morroni admitted the signature on the document was hers, but had no recollection of the time or circumstances of signing it. The Morronis were neighbors of the Cecalas but not related or named in the will.

The signature of Rosaria Cecala is admittedly genuine.

It should be noted, also, that R. Anzalone testified on cross-examination that his brother-in-law (appellant Rosario Cecala) was in the house when he signed the document.

Respondent testified that she lived with her parents at the ranch from 1934 until her father died and thereafter

until 1945; that a few weeks after she returned home in 1934 (after an estrangement) her father told her he had made a will in 1933, the general provisions of which he disclosed to her. She testified that he said he had cut her "out of the property, and that he was going to change that, being that I had returned home and that I didn't have to worry, that he would take care of me and the baby." When asked what he had said he intended to do about a new will she answered "he said the property was to be divided equally amongst the three children." She testified that before his illness her father discussed the question of his property on several occasions "and then when he became ill he mentioned it several times." His last illness was of but five or six days' duration. During his convalescence from an earlier illness he mentioned to respondent in the presence of her mother and brother that he wanted to go to a lawyer and draw up a new will. He said this seven or eight times during his convalescence.

About the second day of his last illness "he said he wanted to make this new will"; he tried to get up; "he was looking for his clothes" but his wife told him he was too ill. He told respondent he wanted to "go down town to the lawyer to draw a new will because he didn't get to draw that will yet." He tried on two or three occasions to get up but "he couldn't make it." She testified: "Finally . . . he asked me if I would write up a will for him; and then Mr. and Mrs. Morroni came over and he asked them if they would be witnesses to this new will, and they said 'Yes'; so he called me and he dictated in his own words what he wanted in this will." The Morronis and respondent's mother were present at this time. Respondent testified that she made a few notes of what her father said, and he asked the Morronis to come back the following day to sign it. Respondent typed the will the following day and read it to her father; he said it was all right; that her brother-in-law, R. Anzalone, came in and "my dad told him he was having me type up a will, and asked him if he would come back and sign it as a witness, and my brother-in-law said 'Yes; I will stop in on my way home from town.'" He stopped in that evening and at her father's request she called the Morronis, who came over. She testified that Mr. and Mrs. Morroni, her brother-in-law (R. Anzalone), her mother, and herself were present in the bedroom with her father. Then: "My father asked me to bring the will that I had typed, and . . . to read it to them, and I read it, and my dad asked me to bring a pen, and I handed him the pen

and he signed his cross and asked me to write his name in there for him, and then he asked my brother-in-law to sign it, and the Morronis, and my mother.'' Respondent wrote ''Philip Cecala'' and ''his mark'' and ''witnessed by.'' Testator, she said, asked the others to sign as witnesses, telling them it was his will, and all four signed it in his bedroom in his and in each other's presence.

She testified that after it was signed she ''didn't see it any more'' and the last one who had it in the room was her mother. She testified that she never saw the will after that ''until today''; never had it in her hands until it was handed to her in the courtroom.

These two versions present a clear-cut conflict.

■ On appeal the weight to be accorded the evidence and the province of the reviewing court are the same in a will contest as in any other civil case (*Estate of Bristol,* 23 Cal.2d 221 [143 P.2d 689]; *Estate of Teel,* 25 Cal.2d 520 [154 P.2d 384]; *Estate of Trefren,* 86 Cal.App.2d 139 [194 P.2d 574]; *Estate of Llewellyn,* 83 Cal.App.2d 534 [189 P.2d 822, 191 P.2d 419]; *Estate of Pohlmann,* 89 Cal.App.2d 563 [201 P.2d 448].) The rule respecting conflicting evidence being the same as in other civil cases, appellants have the burden of showing that there is no substantial evidence to sustain the verdict. This court must view the evidence in the light most favorable to respondent and resolve all conflicts in her favor.

■ Under settled rules appellants had the burden of overcoming a well-recognized presumption. Admittedly the signatures of R. Anzalone, P. Morroni, Rosi Morroni and Rosaria Cecala are genuine. Thus there were on the face of the document the signatures of ''at least two attesting witnesses'' (Prob. Code, § 50). There was not, it is true, the conventional attestation clause, but such clause was not necessary (*Estate of Tyler,* 121 Cal. 405 [53 P. 928]; *Estate of Pitcairn,* 6 Cal. 2d 730 [59 P.2d 90]). The document therefore came before the trial court clothed with the presumption that it had been duly executed, and such presumption is ''independent evidence which may be weighed against positive testimony'' (*Estate of Pitcairn, supra*).

■ Moreover, the testimony of Messrs. Anzalone and Morroni went in subject to another well-recognized rule, for it has been settled law in this state ever since *Estate of Tyler, supra* (1898), and perhaps before, that ''When a witness who has solemnly subscribed his name to a will as an attesting witness, knowing the nature of his act, and that deceased would rely

upon his name as a part of the execution of the will, undertakes by his evidence to overthrow or cast suspicion upon it, his evidence should be closely scrutinized.'' (*Estate of Motz,* 136 Cal. 558, 561 [69 P. 294].) (See, also, *Estate of Dow,* 181 Cal. 106, 113 [183 P. 794] and *Estate of Novotny,* 94 Cal. App. 782, 787 [271 P. 923].) In *Estate of Wright,* 7 Cal.2d 348 [60 P.2d 434], the court comments on the rather strong language with which the decisions have characterized the testimony of witnesses who have signed a testamentary document and thereafter repudiated it, and remarks that what we have just quoted from *Estate of Motz* ''must be in the mind of every person who gives any thought to the subject.'' The jury was given an instruction containing the substance of that rule.

■ That a will may be proved otherwise than by the subscribing witnesses is definitely settled. Section 1941, Code of Civil Procedure provides that ''If the subscribing witness denies or does not recollect the execution of the writing, its execution may still be proved by other evidence.''

Here one of the four witnesses had died; one did not recollect the execution of the writing and the other two denied it outright.

At 10 California Jurisprudence, page 874 it is said: ''The early decisions indicate that prior to the adoption of the code proof of an instrument by a subscribing witness was the preferred mode. No such preference is recognized by the code, however; nor is undue weight to be attached to the testimony of such a witness . . .'' (Quoting § 1941, *supra*.)

At 26 California Jurisprudence, page 793 it is said: ''A denial by one of the witnesses that the statutory requirements were complied with does not necessarily require a rejection of the propounded instrument. Section 1941 of the Code of Civil Procedure provides that if the subscribing witness denies the execution of the writing, proof may be made by other evidence. Admission of the paper to probate may be decreed on the testimony of the other witness and the inference to be derived from the attestation clause, or the testimony of another witness may be accepted, and the statements of the attesting witnesses rejected. . . .'' (*Estate of Motz, supra,* and *Estate of Dow, supra,* are cited.)

In this case it appears that the jury accepted the testimony of Sarah Naso and rejected that of Messrs. Anzalone and Morroni.

*In re Weber,* 15 Cal.App. 224 [114 P. 597], is directly in point and is illustrative of the rule. Weber made a will, followed seven months later by a codicil to which there were two attesting witnesses. Both witnesses on the contest gave testimony which was inconsistent, to say the least, with their role as subscribing witnesses and with the testimony they had given on its admission to probate. Indeed it might be said to have been a "denial" of the due execution of the codicil. The testimony of one of these witnesses *on the contest* was in some respects similar to that in this case. She "testified that nothing was said by the testator; that she was requested by Mr. Bender to come to Mr. Weber's room and sign a paper; that Mr. Weber said nothing and Mr. Bender said nothing, 'only to sign'; that she knew nothing at all about what she was signing." Bender, a close friend of the testator and his executor, was present at the execution and gave testimony showing the usual acts and declarations of a person executing a will and of the two attesting witnesses. The court held (p. 238) that there was "nothing in the evidence . . . which would justify us in holding that the trial court erred in accepting Mr. Bender's testimony and rejecting that of the two subscribing witnesses."

At 4 Wigmore on Evidence (3d ed.), page 599, section 1301, the author says that any rule other than that just discussed "would be unfair and disastrous, especially in testamentary causes."

No facts need be stated herein beyond those necessary for an understanding of the legal points involved on the appeal. Such facts have been given, but in fairness it should be said that there was an abundance of evidence from which the jury could have reached a contrary conclusion, notably the delay of about 11 years in presenting the 1935 will for probate. Apparently the jury was satisfied on that score. Testator had made a will in 1933, which was offered for probate by the widow almost two years after his death. It left a life estate to the widow, on whose death Sarah was to get $500, while her sister was to get a half interest in a 23-acre ranch and her brother was to get a 15.75-acre ranch. The 1935 will left a life estate to the widow, and on her death the estate was to be divided in equal thirds to the children. Distribution under the 1933 will had been decreed in 1941 but respondent never got her $500.

There was evidence of strife and litigation within the family. All this was freely admitted in evidence and fully aired before

the jury. It showed, however, a reconciliation between respondent and her parents in 1934 which remained unbroken thereafter.

█ Appellants attack an instruction which told the jury that certain evidence had been admitted for a limited purpose. Rosario Cecala testified that in 1942 his mother delivered to him the document dated February 9, 1935, telling him at the time that respondent had forged it and had prevailed on the four witnesses (including herself of course) to sign it after the decedent had expired, and directing him to destroy it. Rosario's wife testified to a conversation she had had with the widow to the same general effect. Both conversations were hearsay, of course, and were strenuously objected to. The court instructed the jury that these declarations could be considered ''only for the purpose of explaining in some degree what may have happened to the document'' after the death, and that they should be viewed with extreme caution. The widow's hearsay declarations that her daughter had forged the father's will, standing alone and without the cautionary instruction, would have been most harmful to respondent's case, and such instruction was not only proper but was absolutely necessary as long as the hearsay evidence had been admitted.

█ Appellants attack the instruction based on section 1844, Code of Civil Procedure, which told the jury that ''The testimony of one witness worthy of belief is sufficient for the proof of any fact . . ..'' Respondent's testimony was directly opposed to that of Messrs. Anzalone and Morroni, and she was certainly entitled to the instruction, given in every civil and criminal case (except in perjury and treason cases).

Appellants argue that the fact that the widow did not file this 1935 will for probate but filed the earlier one of September 11, 1933, is convincing evidence that the 1935 will was forged. As we have already pointed out, there was a delay of about 11 years in filing the 1935 will. The jury could have concluded from that delay that respondent did not want the 1935 will to come to court while her mother lived, but that was a question exclusively for the jury. So, too, with respect to the filing by the widow of the 1933, rather than the 1935, will. The appellant, Rosario Cecala, not the respondent, had possession of the 1935 will from 1942 when his mother gave it to him until he and Rosa Anzalone produced it in 1946 in obedience to an order of court which respondent procured.

■ Error is claimed in the court's rejection of certain tendered evidence of an occurrence in 1926, which appellants claim showed wrongdoing on respondent's part. They argue that it might have supplied the reason for the estrangement. The court held it too remote—nine years before the 1935 will—moreover there had been a reconciliation in 1934. It was not admissible as impeachment (Code Civ. Proc., § 2051).

It cannot be said that respondent's testimony is wholly lacking in corroboration. Rosi Morroni testified that she did not remember signing. On cross-examination she was asked "Are you in the habit of signing papers without knowing what they are, Mrs. Morroni?" and she gave the emphatic answer "No sir-ee." She then admitted that she knew that placing her signature on a paper was liable to be a pretty important matter. ■ Moreover, "Where an attesting witness has no recollection as to certain matters connected with the making of the will, the case is, upon principle, in the same condition as where he is dead, insane, or absent; and in such case 'proof of the handwriting of the testator and of the subscribing witnesses, or any of them, may be admitted as evidence of the execution' (Code Civ. Proc., sec. 1315); *and such evidence is sufficient, in the absence of any countershowing, to prove the execution.*" (*Estate of Tyler,* 121 Cal. 405, 409, *supra*; emphasis added.)

No difficulty arises from the fact that the execution was by mark, since "signature or subscription includes mark, when the person cannot write, his name being written near it by a person who writes his own name as a witness"; (Code Civ. Proc., § 17; Civ. Code, § 14; see, also, *In re Guilfoyle,* 96 Cal. 598 [31 P. 553, 22 L.R.A. 370]; *In re Mullin,* 110 Cal. 252 [42 P. 645]; *Estate of Holloway,* 195 Cal. 711 [235 P. 1012]).

■ The verdict was assented to by 11 jurors. The affidavit of the other juror was filed on the motion for new trial. It deposed that the jurors resented Rosario Cecala's attitude in answering questions "in coming back with counter questions"; that they "were filled with sympathy for Mrs. Naso"; that "to my mind, the evidence was not weighed at all." No attempt was made to show the verdict was reached by resort to chance, which was really the ground specified in the motion. The verdict could not be upset on such a showing (Code Civ. Proc., § 657, subd. 2; 24 Cal.Jur. 877; 18 McK. Dig., "New Trial," § 169 and cases cited).

There was no showing of newly discovered evidence.
We find no error in the record.
The order is affirmed.

Dooling, J., concurred.

A petition for a rehearing was denied August 13, 1949, and appellants' petition for a hearing by the Supreme Court was denied September 12, 1949. Traynor, J., voted for a hearing.