[Civ. No. 24678. Second Dist., Div. One. Nov. 4, 1960.]

Estate of AMELIA ANN EDWARDSON, Deceased. THE FIRST CHURCH OF CHRIST, SCIENTIST, IN BOSTON, MASSACHUSETTS, Appellant, v. THE STATE OF CALIFORNIA, Respondent.

Lindstrom, Robison & Lovell, Jack R. Lovell, William T. King and Arthur W. Eckman for Appellant.

Stanley Mosk, Attorney General, and Bonnie Lee Martin, Deputy Attorney General, for Respondent.

FOURT, J.—This is an appeal by the beneficiary of an alleged last will from a judgment determining that decedent died intestate and denying probate of the will.

On February 17, 1959, a petition for the probate of a lost will and the issuance of letters of administration with the will annexed or in the alternative for letters of administration was filed by John Baker. Among other things he alleged in the petition that:

"That Verna McBride and Edwin H. McBride are named as Executor and alternate; that both are deceased. That decedent left no heirs. That petitioner is a friend and her guardian; that the public administrator has declined to act and there are no creditors of the estate. That John E. Baker, petitioner, consents to act."

It was further set forth that the "Mother Church, First Church, Christ Scientist, Boston, Massachusetts" (hereinafter referred to as either appellant or the Church) is the devisee and legatee named in the will.

On March 6, 1959, a hearing was had on the petition and the purported lost will was denied probate. The petitioner was appointed the administrator of said estate and letters were ordered to issue upon petitioner giving a bond in a stated amount. Marshall Hickson was the attorney for the petitioner and at the time of the hearing upon the petition he stated to the judge that he did not have two credible witnesses to the will as required by section 350 of the Probate Code.[1]

---

[1] Section 350 of the Probate Code provides:

"No will shall be proven as a lost or destroyed will unless proved to have been in existence at the time of the death of the testator, or shown to have been destroyed by public calamity, or destroyed fraudulently in the lifetime of the testator, without his knowledge; nor unless its provisions are clearly and distinctly proved by at least two credible witnesses."

Counsel for the Church filed and had granted a motion to set aside the order denying probate of the will. A new petition to probate the lost will and for letters of administration with the will annexed was filed on May 22, 1959, by the Church. The State of California filed a "Contest of Will before Probate and Objections. . . ."

A hearing was had on the second petition and the court found in effect that the provisions of the will were not proved by two credible witnesses and that the will was not duly executed. A judgment was made and entered to the effect that the decedent died intestate and the will offered for probate was denied.

A résumé of some of the facts is as follows:

Amelia Ann Edwardson, hereinafter referred to as Amelia, had three successive guardians; i.e., Edwin McBride (who was appointed when Amelia was declared to be incompetent); his wife, Verna McBride; and John Baker, the son of Verna McBride. Hickson was the attorney for each of the guardians.

Amelia had suffered a stroke and was unable to talk or use her limbs. In December 1949, Edwin McBride, a Christian Science practitioner, was giving her treatments. Amelia was a retired school teacher confined to bed in a rest home. Edwin McBride went to Hickson's office a day or so before December 16, 1949, and told Hickson that a lady (Amelia) whom he was treating required a guardian, that she was no longer able to take care of her own affairs and that she desired to make a will leaving all of her property to him (McBride) and on his death to his wife and that when they were both gone, then to the Christian Science Church.

Hickson never knew or ever talked to Amelia before he prepared the will. He took McBride's word for it that Amelia had no relatives or heirs and further took his word for the other provisions of the will.

Hickson caused his secretary, Helene Scvarda, to type out a form of will. One original copy and one carbon copy were made. The carbon copy was placed in Hickson's office files. The secretary stated that the carbon copy looked like one of "our carbon copies of the will"; however she had no independent recollection of typing the will and that the will did not stand out in her memory. She never saw the original copy of the will after Hickson took it from the office. She never saw Amelia nor did she ever talk to her. She did not recall whether Hickson had ever reported to her that the will was signed by Amelia.

Hickson took the will to the rest home where Amelia resided. Edwin McBride was with him and introduced him to Amelia as the lawyer. Amelia could not talk, nor even utter a word. Hickson read the document which he had prepared and asked if that was what she wanted and she nodded. He did not discuss any of the specific terms of the will with Amelia. Two ladies, namely Mrs. Johnson and Mrs. Sabin, who operated the rest home came into the room. Hickson asked Amelia if she wanted to sign the will and she nodded. With the assistance of Hickson she made an "X" at a place indicated by Hickson in the presence of Mrs. Johnson and Mrs. Sabin. Hickson then asked Mrs. Johnson and Mrs. Sabin if they would sign the document as witnesses to the mark that Amelia had made and they did so. Hickson then asked Amelia if she wanted the two ladies to sign the document as witnesses to her signature and she nodded. The ladies signed it in her presence and in the presence of each other.

The will was then given to Edwin McBride and Hickson never saw the document again. Amelia's papers and documents were kept by the McBrides. Some time later Hickson received from Edwin McBride a document which apparently purported to be a copy of the will as executed on December 16, 1949. The office carbon copy was introduced into evidence as Exhibit 1. The purported McBride copy, which was sent to Hickson by McBride, was introduced into evidence as Exhibit 2, but not as proof of the contents of the will. The office carbon copy was never conformed to the original after it was signed.

The wording of the body of the two exhibits is the same with the exception that in Exhibit 2, two words were omitted. Exhibit 2 contained a typewritten "X" below the last paragraph of the first page of the document. The names of Grace E. Sabin and Elsia E. Johnson were typed in as witnesses to the mark. In handwriting the figures "16" were written in indicating the date of the month the will was purportedly signed. The names of Elsie E. Johnson and her address and Grace E. Sabin and her address were typed in as witnesses to the execution of the will on the second page of the document. The blank spaces in the office carbon copy (Exhibit 1) were not filled in nor were the names of any witnesses placed thereon. Amelia's name was not written opposite the "X" mark on Exhibit 2, nor any place therein, with the exception that it was typed in the first line of the purported will.

After the document was thus executed Edwin McBride was

appointed the guardian of Amelia. About three or four years later McBride died and his wife, who was also a Christian Science practitioner, was appointed successor guardian. Mrs. McBride died and her son, John Baker, was appointed the acting guardian.

After the death of Amelia on December 15, 1958, Hickson made a search for the original will in all of the guardianship files in his office. His secretary also looked for the original will. The will was never found. After Mr. McBride died Hickson asked Mrs. McBride to go through Mr. McBride's papers and attempt to locate the will. Mr. McBride was never at any time incompetent, mentally disabled or forgetful. Mrs. McBride was on occasion forgetful and once or twice lost a check; however, Hickson did not think she was incapable or incompetent to handle the guardianship of Amelia. When Mrs. McBride died her son went through her papers carefully and did not find any will. Hickson is the only living competent witness to the will. Grace E. Sabin died in January 1956 and Mrs. Johnson is living but wholly incompetent.

The appellant's first contention is that the allegedly lost will was properly subscribed and witnessed. Probate Code, section 50, provides that every will (with one exception) must be in writing and must be executed as follows:

"(1) [*Subscription.*] It must be subscribed at the end thereof by the testator himself, or some person in his presence and by his direction must subscribe his name thereto. A person who subscribes the testator's name, by his direction, should write his own name as a witness to the will, but a failure to do so will not affect the validity of the will.

"(2) [*Presence of witnesses.*] The subscription must be made, or the testator must acknowledge it to have been made by him or by his authority, in the presence of both of the attesting witnesses, present at the same time.

"(3) [*Testator's declaration.*] The testator, at the time of the subscribing or acknowledging the instrument, must declare to the attesting witnesses that it is his will.

"(4) [*Attesting witnesses.*] There must be at least two attesting witnesses, each of whom must sign the instrument as a witness, at the end of the will, at the testator's request and in his presence. The witnesses should give their places of residence, but a failure to do so will not affect the validity of the will."

Section 17 of the Code of Civil Procedure with reference to the meaning of certain words and phrases reads in part

as follows, "... signature or subscription includes mark, when the person cannot write, his name being written near it by a person who writes his own name as a witness; ..." Section 14 of the Civil Code contains in part the identical provision just mentioned.

The codes permit the substitute signature under limited circumstances. If the testator cannot write, then the mark is permitted if the name of the testator is written out by the witness and the name of the witness is added. (*Estate of Cecala,* 92 Cal.App.2d 834, 842 [208 P.2d 436]; *Estate of Dombrowski,* 163 Cal. 290 [125 P. 233]; *Estate of Simmons,* 65 Cal.App.2d 533 [151 P.2d 8].)

 It was recently stated in *In re Estate of Howell,* 50 Cal.2d 211, 215 [324 P.2d 578]:

"Statutory requirements must be strictly followed in the execution of a will, and the testator's intention is not to be considered in determining whether such requirements have been met. (*Estate of Moore,* 92 Cal.App.2d 120, 122 [1] [206 P.2d 413].)"

In the *Estate of Seaman,* 146 Cal. 455, 462 [80 P. 700, 106 Am.St.Rep. 53, 2 Ann.Cas. 726] it is stated:

"The formalities which the legislature has prescribed for the execution of wills are to provide against false and fraudulent wills, and to afford means of determining their authenticity....

"It is immaterial that there is no charge of fraud in any particular case. A failure to comply with the formalities required by a statute enacted for the prevention of fraud is not excused by showing that in the particular case under consideration there was no fraud. The statute in question [Cal. Civ. Code, § 1276, as it existed in 1905[2]] was enacted to protect the wills of the dead from alteration. If opportunity for such alteration is permitted the fraud may be so deftly accomplished as to prevent its discovery, and for this reason the construction to be given the statute should be such as will control the execution of all wills...."

The judge from the evidence before him correctly determined that in this case the name of the testatrix was not written near her mark, or anywhere else on the document by a witness to the mark. The only place the name of the testatrix appears on the document is where it was typed in on the first line of the first page. The typing of the name at the

---

[2]Section 50 of the California Probate Code, the statute here in question, was derived from California Civil Code, section 1276.

start of a will is not a signature. (*Estate of Manchester,* 174 Cal. 417, 419 [163 P. 358, Ann.Cas. 1918B 227, L.R.A. 1917D 629]; *In re Walker,* 110 Cal. 387, 393 [42 P. 815, 52 Am.St. Rep. 104, 30 L.R.A. 460].)

Appellant asserts that the provisions of the Civil Code and the Code of Civil Procedure do not apply to the provisions of Probate Code, section 50, and that it is unnecessary to write the name of the person near the mark made by such person. In *Estate of Moore,* 92 Cal.App.2d 120, 122-124 [206 P.2d 413] it is stated:

"The exception above recognized, that one who cannot write may make his mark, implies that a subscription must be hand written, if the subscriber can write; otherwise he may make his mark. But whoever witnesses the mark must himself write the name of the maker of the mark, as well as his own name as witness. No other exception is provided.

"It is generally held that statutes relating to the execution of wills must be strictly followed. In *Estate of Seaman, supra,* at page 463, it is said that a failure to comply with the formalities required by a statute enacted for the prevention of fraud is not excused by showing that in the particular case under consideration there was no fraud.

". . . . . . . . . .

"While in some cases it has been said that an instrument is deemed signed although the signature is typed, lithographed, rubber-stamped, printed or photographed, even assuming that such a signature might, under some circumstances, be held sufficient to render an instrument enforceable, we think that in the case of a will the statute requires a handwritten signature, or, at the very least, that if typewritten it must be shown that the name of the testator was typed by the testator himself or by some one person in his presence and by his direction who then subscribed his name thereto. To hold that the mere typed name of a testator is sufficient to satisfy the requirements of section 50 of the Probate Code would open the door to an easy form of fraud, when the purported signer was dead. We are in accord with the statement of Mr. Justice Beatty, in *Estate of Seaman, supra,* when he said, page 465:

"'He [appellant] insists that section 1276 of the Civil Code [now Prob. Code, § 50], like the rest of its provisions must be liberally construed "with a view to effect its objects and promote justice." (Civ. Code, § 4.) I fully agree with him on this proposition, but I apply it differently. His argument is

in effect that we should give a liberal construction to wills which deviate from the statute in the mode of their execution for the purpose of sustaining them, whereas a proper application of the principle requires us to give a liberal construction and full effect to every provision of the statute designed to prevent the probate of spurious wills, although in so doing we may in a particular instance defeat an honest attempt on the part of a decedent to make a testamentary disposition of his estate. The evil of occasionally defeating such an attempt is far less serious than the establishment of a precedent which would open the door to the frauds which the statute was designed to prevent. Every statute of frauds is designed to promote justice by requiring wills and contracts to be executed with such formalities and *indicia* of genuineness as to make simulated and fraudulent writings of the classes defined impossible, or at least very difficult. Such statutes in the long run promote justice—which is their sole object—by shutting out opportunities of fraud. Where they defeat one honest purpose they prevent unnumbered frauds, which in their absence would be feasible and measurably safe. It would not, therefore, be a proper application of the principle invoked to weaken by construction the requirements of our statute prescribing the requisites of a valid will. By so doing we should no doubt be dealing most liberally with the efforts of decedents who have disregarded the law, but we should not be construing the law liberally to effect its objects. And unless we are to set ourselves up as better judges of the true policy of the law than the legislature, we should not be promoting justice.' "

Appellant relies heavily upon *In re Guilfoyle,* 96 Cal. 598 [31 P. 553, 22 L.R.A. 370], but in that case the name of the person appeared in the beginning of the instrument and was written by the person who signed as a witness. Furthermore, the whole document was only one sentence long. (See also *Weiss* v. *Hanscom,* 305 Ky. 687 [205 S.W.2d 485].)

Appellant has argued that the method used in this case has been proper since the Victorian Wills Account. California courts have held that the English statutes are not applicable where California has a particular statute dealing with the particular subject matter. (*In re Walker, supra,* 110 Cal. 387 [42 P. 815, 52 Am.St.Rep. 104, 30 L.R.A. 460].)

Oklahoma has a statute substantially the same as the applicable portions of Civil Code, section 14 (Oklahoma Stats., § 2945). The courts of Oklahoma have held that written instruments which are required to be signed or subscribed are

invalid where the maker's name signed by a cross mark was written near the mark by someone who did not sign his own name as a witness as required by statute. (*Kemper* v. *Todd,* 123 Okla. 209 [255 P. 701] ; *Walker Bond & Co.* v. *Purifier,* 32 Okla. 844 [124 P. 322] ; see also *In re Hunter's Estate,* 328 Pa. 484, 489 [196 A. 35, 38] ; *In re Cohen's Estate,* 356 Pa. 161 [51 A.2d 704, 706].)

The New York cases cited by appellant are not appropriate because New York does not have a statute similar to ours with reference to the subject matter.

Appellant also argues that when the Probate Code was adopted any application of section 14 of the Civil Code in the matter of wills was repealed. Section 1700 of the Probate Code provides otherwise. The code revision commission was not, in the case of the Probate Code at least, authorized to make any substantive changes in the law. The Probate Code also provides in itself that the provisions of the code as far as they are substantially the same as existing statutes, must be construed as continuations thereof and not as new enactments. Probate Code, section 2.

Appellant's second contention is that "the secretary who typed the will from her shorthand notes is a credible witness to the contents of the lost will."

It is undisputed that Hickson, the attorney who prepared the will constitutes *one* credible witness. He testified that he prepared the will which was then typed by his secretary, Helene Scvarda. An original (ribbon copy) and one carbon copy was made. The ribbon copy was delivered to Hickson who then took it to the rest home to be executed by the decedent.

Miss Scvarda never saw the original will after it was delivered to Hickson. She never saw the decedent. She never saw the contents of the original will after it was executed, nor did she discuss the contents with anyone. One witness to the will is dead and the other is incompetent.

Hickson is the only living witness to the fact that the original will, as typed by Miss Scvarda, was the same will as that actually executed by decedent. The only person who could identify the carbon copy as a true and accurate copy of the original will as executed, was Hickson. There is only the *one* witness to establish the fact that no changes were made in the original before it was executed, and to establish that the carbon copy is a true and accurate copy of the original will.

The mandate of section 350 is clear. There must be "at least

two credible witnesses." A similar problem was raised in *Hull v. Cartin,* 61 Idaho 578 [105 P.2d 196]. The Idaho code provision was similar to that of California. The court stated at page 200:

"According to the statute, there is one fact that must be 'clearly and distinctly proved by at least *two credible witnesses*' and that fact is the *'provisions'* of the will. Here we have the provisions of the will (a verbatim copy) proven 'clearly and distinctly' by one credible witness, . . . At this point we are halted in our quest for proof. No other *witness* knows or is able to testify that the executed will actually contained the matters and things contained in the copy identified and proven by Mr. Hull. . . . (Emphasis added by that court.)

"This statute authorizing the proof of the contents of a lost will is intentionally strict and prescribes definite and certain proof that *must* be produced; the statute is clear, plain, unambiguous, and mandatory. . . . (Emphasis added by that court.)

"We are unable to hold that any substitution of circumstantial evidence, hearsay, . . . can be accepted in lieu of one of the required 'two credible witnesses' in proof of the provisions of a lost will. . . . The difficulty of making the proofs required by the statute can not obviate the necessity of doing so."

In the case before this court there was neither a proper subscription nor compliance with section 350 of the Probate Code.

For the reasons stated, the judgment is affirmed.

Wood, P. J., and Lillie, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied December 28, 1960.